**331 P.2d 814**

**Robert J. BERRY, Plaintiff and Appellant,**

**v.**

**Louis G. MOENCH, Defendant and Respondent.**

**No. 8786.**

Supreme Court of Utah.

Nov. 12, 1958

194

Sumner J. Hatch, Ray S. McCarty, Salt Lake City, for appellant.

Skeen, Worsley, Snow & Christensen, Salt Lake City, for respondent.

CROCKETT, Justice.

Robert J. Berry appeals from an adverse jury verdict and judgment in a suit against Dr. Louis G. Moench for publishing in a letter allegedly false and derogatory information acquired in connection with treating Mr. Berry as a patient.

Significant portions of the letter are:

"Dear Dr. Hellewell:

"Since I do not have his authorization, the patient you mentioned in your last letter will remain nameless,

"He was treated here in 1949 as an emergency. Our diagnosis was Manic depressive depression in a psychopathic personality * * *

"He had one brother as a manic, and his father committed suicide * *

"The patient was attempting to go through school on the G. I. bill * * * Instead of attending class he would spend most of the days and nights playing cards for money.

"Because of family circumstances, we treated him for a mere token charge (and I notice even that has never been paid).

"During his care here, he purchased a brand new Packard, without even money to buy gasoline.

"He was in constant trouble with the authorities during the war, * * *

"* * * did not do well in school, and never did really support his wife and children.

"Since he was here, we have repeated requests for his record indicating repeated trouble. * * *

"My suggestion to the infatuated girl would be to run as fast and as far as she possibly could in any direction away from him.

"Of course if he doesn't marry her, he will marry someone else and make life hell for that person. The usual story is repeated unsuccessful marriages and a trail of tragedy behind."

The above letter was written September 12, 1956, in response to one in which Dr. J. S. Hellewell of Evanston, Wyoming had requested information concerning Mr. Berry, asking for "your impression of the man," for the stated purpose of passing it on to a Mr. and Mrs. Williams, parents of Mary Boothe who was then keeping company with Mr. Berry.

The information supplied by Dr. Moench had been obtained seven years earlier in connection with the psychiatric treatment of Mr. Berry. The latter had been having marital difficulties and at the request of his then wife, Ethella Berry, had gone to Dr. Moench. His condition was diagnosed; electric shock treatments recommended and four of them were given. Dr. Moench had not seen plaintiff since that time.

The letter was relayed by Dr. Hellewell to the Williamses and in turn to their daughter, Mary Boothe. Consequently the parents became violently opposed to the marriage. They have since disowned their daughter because she went ahead and married the plaintiff and they are now husband and wife.

In justification of writing the letter, Dr. Moench relied on these defenses: That the statements were true; that he had a reasonable basis for believing them to be true; that he made them under conditional privilege; and that they were not defamatory.

At the pre-trial the court ruled as a matter of law that the doctor had a conditional privilege to make the statements. At the trial the jury was so instructed; and that

any finding of malice must be shown by evidence independent of the letter; and also that if the statements were true, or if the doctor had probable cause to believe the statements to be true, that would constitute a defense. These rulings are here assigned as error.

It is recognized that ordinarily the truth is a defense to an action for libel or slander. However, in the instant case there is the special circumstance to reckon with, that a doctor-patient relationship existed between the parties in connection with which Dr. Moench acquired the information upon which he based the letter. That relationship is among those with respect to which it is the policy of the law to encourage confidence. This policy is expressed in Sec. 78–24–8, U.C.A.1953 which provides, inter alia, that a physician cannot be examined as to any information acquired in attending his patient.[1] It is grounded upon the advantage to all concerned in encouraging the full disclosure of all facts which may have a bearing upon diagnosis and treatment of the patient. If the doctor could with impunity publish anything that is true, the patient would be without protection from disclosure of intimacies which might be both embarrassing and harmful to him. This would make him reluctant to tell some things even though they might be important in the treatment of his ills. For this reason it is obligatory upon the doctor not to reveal information obtained in confidence in connection with the diagnosis or treatment of his patient. It is our opinion that if the doctor violates that confidence and publishes derogatory matter concerning his patient, an action would lie for any injury suffered. That of course, presupposes the absence of any privilege, as hereinafter discussed. Compare the obiter dicta statement of the Supreme Court of Washington, " *  *  * for so palpable a wrong, the law provides a remedy," which statement was similarly quoted with approval by the Nebraska Supreme Court in Simonsen v. Swenson.[2] That Dr. Moench himself was aware of his duty not to reveal the secrets of his patient without the latter's consent is shown in the letter, "Since I do not have his authorization, the patient  *  *  * will remain nameless. *  *  *"

We do not doubt the correctness of defendant's contention that the responsibility of the doctor to keep confidence may be outweighed by a higher duty to give out information, even though defamatory, if there is a sufficiently important interest to protect. In such event there arises a con-

---

1. Sec. 78–24–8, U.C.A.1953: Privileged Communications: also prohibits testimony re communications between: husband-wife; attorney-client; priest-confessor; physician-patient.

2. 104 Neb. 224, 177 N.W. 831, 833, 9 A.L.R. 1254; see also, Munzer v. Blaisdell, 183 Misc. 773, 49 N.Y.S.2d 915.

ditional privilege to make a disclosure reasonably necessary to protect such interest.

The usual situation giving rise to the privilege is where the interest being protected is that of the publisher. Illustrative of this is the case of Combes v. Montgomery Ward & Co.,[3] relied on by the defendant, wherein we referred with approval to Sec. 594 of the Restatement of Torts. There the statement concerning pilfering of funds was made in the presence of another employee in connection with an investigation of peculations from the cash receipts. It was pointed out that the act was essential to the protection of the interest of the publisher and did not extend beyond the necessity of that purpose. That rule has no application to the instant situation because Dr. Moench had no interest which was being protected by giving out this information.

It should be kept in mind that this is not a situation where a patient had gone to a second doctor for treatment and the latter requested information from the first doctor to assist him in the diagnosis. Conceding that professional custom and comity require that this be permitted in a proper case for the help and protection of both doctors and patients, this is not such a case. Dr. Hellewell had never seen Mr. Berry and had no concern with him as a patient.

We recognize that such a privilege may also extend to the protection of the interests of third persons under proper circumstances. Where life, safety, well-being or other important interest is in jeopardy, one having information which could protect against the hazard, may have a conditional privilege to reveal information for such purpose, even though it be defamatory and may prove to be false.[4] But the privilege is not something which arises automatically and becomes absolute merely because there is an interest to protect. It has its origin in, and it is governed by, the rule of good sense and customary conduct of people motivated by good will and proper consideration for others. This includes due consideration for the subject being informed about as well as the recipient being protected. The policy of the law concerning this matter is framed in the light of the hazard that defamation can so easily undermine or destroy a most precious possession: a good name and reputation. In ancient writ it is said "A good name is rather to be chosen than great riches."[5] Recognizing that a good name is so hard to acquire and to preserve, yet so vulnerable to being tarnished, the law imposes upon one publishing derogatory information, even for laudatory purposes, the responsibility of

3. 119 Utah 407, 228 P.2d 272; see (Utah, 1951) 228 P.2d 272.

4. A.L.I. Restatement of Torts, Sec. 595, et seq.

5. Proverbs 22.1.

exercising due care in what he does and in knowing whereof he speaks.

■ One purveying such information about one person to protect another is obliged to consider the likelihood and the extent of benefit to the recipient, if the matter is true, as compared with the likelihood of injury and the extent thereof to the subject, if it prove false, or improper to reveal. Whether the privilege exists, depends upon generally accepted standards of decent conduct. Applying that standard, it exists if the recipient has the type of interest in the matter, and the publisher stands in such a relation to him, that it would reasonably be considered the duty of the publisher to give the information.[6] If the facts upon which the privilege would rest are not in dispute, whether the privilege exists is a question for the court to determine. If they are in dispute the jury must determine the facts and upon them the court determines the question of privilege.[7]

■ We are not disposed to disagree with the trial court's ruling that the circumstances here came within the framework of conditional privilege: that is, that Mary Boothe's concern for her well-being and happiness was a sufficient interest to protect, and that it was within the generally accepted standards of decent con-

duct for the doctor to reveal the information which might have an important bearing thereon. We believe, however, that that is as far as the trial court could go. In submitting the case to the jury on the basis of privilege it was necessary to instruct it as to the limitations upon the manner in which the privilege should be exercised.

■ We are aware that it is frequently stated that where the situation is privileged there is no liability in the absence of actual malice.[8] However, an examination of the authorities reveals that quite generally, when the matter is actually in issue, they are in accord upon a principle which we consider sound and salutary: that the privilege to pass on derogatory information, which proves false, must have been exercised with at least reasonable discertion, or the publisher will be held responsible therefor. This is well summarized in the Restatement of Torts:

> "Even though the occasion is so privileged, a particular person cannot avail himself of the privilege arising therefrom if he abuses the occasion * * * The occasion may be abused by the publisher's lack of belief or reasonable grounds for belief in the truth of the defamatory matter * * *; by the publication of the defamatory

6. See footnote 4 supra Sec. 595.
7. Ibid, Sec. 619.

8. 53 C.J.S. Libel and Slander § 99, p. 156; 33 Am.Jur. 115.

matter for some improper purpose * * *; by excessive publication * * *; or by the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose. * * * "[9]

■ It is significant that the privilege we are here concerned with is referred to as a "conditional" or "qualified" privilege. The reason for the limiting adjectives is that it must be exercised with certain cautions: (a) it must be done in good faith and reasonable care must be exercised as to its truth, (b) likewise, the information must be reported fairly, (c) only such information should be conveyed, and (d) only to such persons as are necessary to the purpose. We comment upon them as applicable to the instant case.

■ (a) It seems hardly necessary to state that one cannot pass on derogatory information indifferent to its truth, or the consequences thereof, but failure to exercise reasonable care and diligence to ascertain the truth destroys the privilege.[10] Dr. Moench was uncertain as to what information came from what sources: the referring doctor (Dr. Miller), the plaintiff, or plaintiff's then wife, Ethella Berry, or her sister. Experience teaches that an unhappy wife of a blighted marriage is not usually the most impartial source of information as to the conduct and character of a disappointing husband; less so a sister-in-law. Nevertheless, Dr. Moench admitted relying on their statements.

As might be expected, plaintiff sharply disagrees as to facts about him as assumed and reported by Dr. Moench. Illustrative are these:

Dr. Moench: that the plaintiff did not do well in school;

Plaintiff: grade school: I was in the top of my class every year; high school: finished in the top 1% of my class, editor-in-chief of the school paper, on student council and participated in other activities; college: in three years grades were above average, admitted flunking two courses.

Dr. Moench: that he was in constant trouble with the authorities * * *

Plaintiff: this simmered down to about three incidents of minor importance.

Dr. Moench: purchased a new Packard without even money to buy gasoline;

Plaintiff: that he had $200 in the bank and received $4,000 inheritance.

9. A.L.I. Restatement of Torts, Sec. 595, comment a; the quoted language adopted and approved in Sheehan v. Tobin, 326 Mass. 185, 93 N.E.2d 524; Ward v. Ares, 29 N.M. 418, 223 P. 766.

10. As was stated by the Pennsylvania Court in J. Hartman & Co. v. Hyman, 287 Pa. 78, 134 A. 486, 488, 48 A.L.R. 567: "Want of reasonable care and diligence to ascertain the truth, * * * will destroy the privilege." (Citing cases.)

Dr. Moench: that he had not paid his bill.

Plaintiff: that of the charge of $50, all but $5 had long since been paid.

As to the latter item, the doctor relied on a red tab on the card, indicating an unpaid bill. He admitted that checking his record would have revealed the fact that all but $5 had been paid.

■ (b) Closely related to the duty to use reasonable diligence as to truth is the requirement that the publisher communicate the information fairly. He is not warranted in reporting as undoubted facts information which may have been derived from sources which render its verity questionable. If it is from mere hearsay or there are other circumstances which would render it open to suspicion of unsoundness, fairness requires him to report such circumstances along with the information.[11] This is especially important as to a doctor. His professional status and his duty to keep the confidence of his patient tend to endow information he gives with more than ordinary credibility. In regard to this requirement, plaintiff makes these points: that the doctor was advising about his present condition, based upon skimpy, unverified information obtained seven years earlier, which he assumed to be true and stated as facts, without stating the source; that even if plaintiff had been mentally ill at the

prior time, it was wrong to assume that he was still so afflicted; and also for the doctor to fail to make any allowance for the possibility of his getting well, or even that his own treatments had any beneficial effect; particularly so when the doctor on cross examination stated that he had treated about 800 patients with this ailment with such success that most of them were getting along quite well and making a success of their marriages.

■ (c) Another aspect of the situation to be considered is the requirement, even under a privileged situation, that only such information should be given as is necessary for the purpose for which the privilege exists.[12] E. g., if the fact that the bill had not been paid had any bearing on the situation, which may be open to question, reasonable effort to supply accurate information should be made. The same observation is pertinent to other items set forth above.

■ (d) There is further question, admittedly more tenuous than the others, as to whether the publication was to more persons than reasonably necessary to afford the protection for which the privilege existed.[13] Neither Mary Boothe nor Mr. Berry were patients of Dr. Moench or Dr. Hellewell, nor had any personal relationship of any character with them. Dr. Hellewell was not acting as a physician to either of

---

11. A.L.I. Restatement of Torts, Sec. 602, comment a.

12. Ibid, Sec. 595, comment a. and Sec. 605.
13. Ibid, Sec. 604.

them, nor to the Williamses. His only objective was in doing what he regarded as a favor to the Williamses who had been his patients. He can properly be regarded only as an intermediary, who was intended to pass the information on through other intermediaries, the Williamses, to the person directly concerned. The likelihood of the parents being greatly concerned and disposed to talk to others about the matter may be taken into account. Conceding that Mary Boothe had such an interest that Dr. Moench properly thought she should be given the information, it seems to us that reasonable minds might entertain the thought that a more direct method of getting the information to her should have been employed than to relay it through others, even though they had made the inquiry in her interest.

It may well be that Dr. Moench did that which was discreet and proper with respect to the principles discussed under (a), (b), (c) and (d) above. We do not presume to say. It appears to us that the evidence provides a basis upon which reasonable minds might differ as to whether he did so in connection with the passing on of information of the character in question. Thus such issues should have been submitted to the jury. Inasmuch as the manner in which the case was submitted did not permit the jury to pass on these issues it is necessary for us to remand the cause for a new trial. In doing so it is incumbent upon us to comment on certain matters that will be pertinent on the retrial.[14]

Libel may be defined as a false and unprivileged publication in writing which assails the honesty, integrity or virtue of another and thereby exposes him to hatred, contempt, or ridicule, or tends to injure him in his occupation.[15] The letter can be regarded as doing so.

In the law of defamation there is an important difference between the term "malice" when used to denote actual malice, or as it is sometimes called, "malice in fact," as contrasted with implied malice or "malice in law." Actual malice or malice in fact may be found only when it appears that the actor was motivated by spite, hatred or ill will against the subject and it must exist before punitive damages can be awarded. There is a lack of proof of the latter type of malice in this case. Malice in law, which is a necessary prerequisite to recovery for libel, may be implied from the intentional doing of the wrongful act of uttering defamatory matter which is false, or without legal justification.[16] Whether such malice existed in the utterance is to be determined from all of the facts and cir-

14. Rule 76(a), U.R.C.P., Joseph v. W. H. Groves Latter Day Saints Hospital, 7 Utah 2d 39, 318 P.2d 330.

15. See 33 Am.Jur. 38; 53 C.J.S. Libel and Slander § 1, p. 32.

16. Ward v. Ares, 29 N.M. 418, 223 P. 766, 768 citing cases.

202

cumstances shown by the evidence, including the contents of the letter.[17]

Remanded for a new trial. Costs to appellant.

WADE and WORTHEN, JJ., concur.

McDONOUGH, C. J., and HENRIOD, J., concur in the result.