**FAIRBANKS PUBLISHING COMPANY,**
an Alaskan Corporation, Appellant,

v.

Elizabeth B. PITKA, Appellee.

Elizabeth B. PITKA, Appellant,

v.

**FAIRBANKS PUBLISHING COMPANY,** an
Alaskan Corporation, and C. W.
Snedden, Appellees.

Nos. 165, 169.

Supreme Court of Alaska.

Aug. 22, 1962.

Rehearing Denied Nov. 24, 1962.

Robert J. McNealy of McNealy, Merdes & Camarot, Fairbanks, Daniel J. Riviera of Garvin, Ashley & Foster, Seattle, Wash., for Fairbanks Pub. Co.

Robert A. Parrish, Fairbanks, for Elizabeth B. Pitka.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

DIMOND, Justice.

Elizabeth Pitka brought this action against the Fairbanks Publishing Company and C. W. Snedden[1] for defamation as a result of certain publications which appeared in the Fairbanks Daily News-Miner, a newspaper owned and published by the Company at Fairbanks, Alaska.[2] Before the case was submitted to the jury the court dismissed the action as to Snedden, and plaintiff has appealed claiming this was error. The jury returned a verdict in favor of plaintiff for $6,000 compensatory dam-

ages and $19,000 punitive damages, and the Company has appealed on the ground that erroneous instructions were given to the jury.

I. *The Company's Appeal.*

Plaintiff was a school teacher at North Pole, Alaska, a small community not far from the city of Fairbanks. In August 1957 she resigned her position, and then a few days later withdrew the resignation with consent of the North Pole School Board. On October 7, 1957, she wrote to the board stating that she wished to resign "effective in thirty days from this date." The minutes of a board meeting held the next day reflect a controversy regarding the effective date of termination of employment. The board wanted plaintiff to leave her position forthwith, whereas she insisted on completing the thirty days stated in her written resignation.

Plaintiff presumably continued teaching for the next ten days. Then on October 18 she received a letter from the board advising her of a meeting held that day at which a motion had been made and seconded "to relieve you of your duties as head teacher and teacher as of October 18, 1957."[3] Apparently plaintiff ignored this notice of termination; for on October 21, 1957, she was handed another letter from the board. This time she was advised not to enter upon the school property under penalty of a complaint being made with "law enforcing agencies to restrict you from doing so."[4]

1. The Fairbanks Publishing Company is a corporation and C. W. Snedden was its president.

2. For purposes of convenience, Mrs. Pitka will be referred to as the "plaintiff", and the Fairbanks Publishing Company, as the "Company".

3. The letter reads:

"October 18, 1957
"Dear Mrs. Pitka:
"This is to inform you that the motion was made by Mrs. Nellie Miller and seconded by Mrs. Cunningham at the School Board special meeting held on October 18, 1957, to relieve you of your duties as head teacher and teacher as of October 18, 1957. The reason for the above

action is that the School Board feels that you are a detriment to the welfare of the school, and you have already turned in your resignation dated October 7, 1957.
"Enclosed is your check covering 14 working days up to and including October 18th.

"Signed: Lowell P. Jenkins,
"President.
"Cecelia Davis,
"Clerk."

4. The letter reads as follows:

"October 20, 1957.
"Dear Mrs. Pitka:
"This letter is to be hand delivered to you as per the minutes of a special meeting of the North Pole School Board on

She was also told at that time by the board president, Lowell Jenkins, that if she went into the school she would be arrested. She nevertheless entered the school. Jenkins followed her in and again asked her to leave. When she refused, he arrested her for disturbing the peace [5] and took her before the deputy magistrate at North Pole where she was given an "arrest ticket" for "disturbing the peace." [6]

While plaintiff was at the magistrate's office she had an extended discussion with a reporter from the Fairbanks Daily News-Miner. That evening the paper carried a front page article regarding plaintiff's difficulties with the school board. There was a banner headline—

"NORTH POLE TEACHER FIGHTS BOARD"

followed by sub-headlines reading as follows:

"Territorial Police Called To Expel Fired Schoolmarm. Dispute at Out-

October 20, 1957, to inform you the the (sic) School Board is again advising you that we do not want you to enter in or on the school property and, if you do so, that, we will sign a complaint with the law enforcing agencies to restrict you from doing so.
"This letter is authorization from the North Pole School Board for Lowell P. Jenkins to handle this case as the N. P. School Board authorized agent.
"Signed: Lowell P. Jenkins, Pres.
"Cecelia Davis, Clerk."

5. The general code of the City of North Pole makes it unlawful to "create a disturbance in a public place" and to "make any breach of the peace". These prohibited actions are included under the general category of "Disorderly Conduct".

6. Plaintiff was released at that time and a hearing was held by the magistrate on October 25. The magistrate advised her not to return to the school, and she agreed. She was then acquitted of the charge.

7. Plaintiff also relied upon another publication, made one year later, as being defamatory. This will be discussed later in the opinion.

lying Community Finds Teacher Defying School Board; She Is Arrested for Disorderly Conduct."

These were the words which plaintiff claimed were false, malicious and defamatory, and upon which she based this libel action.[7]

The Company has raised several points of alleged error. Those which we shall consider are: (1) the trial court's failure to instruct the jury regarding the defense of truth as justification for the alleged libel; (2) the court's instruction that the publication was defamatory per se; and (3) the court's action in submitting to the jury issues of malice and punitive damages.

1. *The Defense of Truth.*

■■ The court refused to give to the jury the Company's requested instruction No. 5 embodying the defense of truth.[8] We hold this was clear error. The rule that prevails in the great majority of American jurisdictions is that the truth of a de-

8. The requested instruction reads as follows:
"(a) You are instructed that the defendants have interposed the defense of truth. The defense of truth is an absolute defense and would constitute a complete justification for the article in question.
"(b) Although the defendants have the burden of proving that the article of which plaintiff complains is true, the law does not require that the defendants prove the article was meticulously and exactly true in all respects, because the differences may be differences of no consequence. It is sufficient if the defendants show that the factual statements are substantially true. If you believe that the factual statements of the article were substantially true then your verdict must be for the defendants.
"(c) A statement is substantially true if its effect on the mind of the ordinary reader is no different than the effect which would have been produced by the exact literal truth.
"(d) You are instructed that although you believe a portion of the article of which plaintiff complains was untrue in respect to its reference to the plaintiff, nevertheless your verdict must be for the defendants unless you further believe that the untrue portions of the article caused damage to the plaintiff."

famatory statement of fact is a complete defense to an action for defamation.[9] That rule is applicable in this case.[10]

■ The jury reasonably might have concluded that the alleged defamatory words were true. Plaintiff's insistence upon continuing her teaching job after being told she had been relieved of her duties and was no longer permitted to enter upon school property could legitimately be characterized as a "fight" with the school board and an act of defiance of the board's decision. The statement that plaintiff had been arrested for disorderly conduct could be justified by proof that she had been arrested for the specific offense of "disturbing the peace" which, according to the terms of the North Pole ordinance, was included in the definition of "disorderly conduct".[11] The statement "territorial police called to expel fired schoolmarm" was erroneous. The police were not called for that purpose, but instead had been summoned by plaintiff because she thought she needed their protection. But she was actually expelled from the school when arrested by Jenkins who, among other things, was a North Pole police officer. Thus, the reported purpose for which the territorial police were called could be considered an immaterial variance from the literal truth. It is not necessary to prove the literal truth of the precise statement made. Slight inaccuracies of expression

are immaterial provided that the defamatory charge is true in substance.[12]

What is left, then, is the assertion that plaintiff had been "fired" as a school teacher. Whether this was true was also a question of fact that ought to have been submitted to the jury for determination, rather than being summarily disposed of by the trial judge.[13] When questioned as to her conversation with the newspaper reporter, plaintiff said that she never recalled hearing the word "fired". But on cross-examination she admitted she was asked to "terminate". A member of the school board testified that the board never "fired" the plaintiff. But this witness did say that the board "wanted her to leave". The president of the board testified that plaintiff had resigned and that she had not been fired. But he also said that on October 8 the board had asked plaintiff to terminate her position as of that date,[14] and that on October 18 she had been asked to stop her active duty at the school because the board felt she was a detriment to the welfare of the school. Plaintiff had insisted that her written resignation, dated October 7, 1957, be effective thirty days later. The board was just as insistent that she be terminated before the thirty days had expired, and finally prevailed by resorting to legal action to physically remove her from the school property on October 21.

9. Restatement, Torts § 582 (1938); Hale, Law of the Press 76–77 (3d ed. 1948); Prosser, Torts § 96, at 630–631 (2d ed. 1955); Yankwich, It's Libel or Contempt if You Print It 358–360 (1950).

10. The general rule has been modified in a few states—by statute in some, and apparently by judicial decision in others— so that elements such as improper motive or malice will prevent truth from being a complete defense. Prosser, Torts § 96, at 631 (2d ed. 1955). Alaska has no such statute, and since these elements are not present in this case (as will be pointed out later in this opinion), we do not decide whether to deviate from the majority rule.

11. See note 5 supra.

12. Restatement, Torts § 582, comment e, at 218 (1938). See also Yankwich, It's Libel or Contempt if You Print It 362–367 (1950); Hearne v. De Young, 119 Cal. 670, 52 P. 150, 151–152 (1898).

13. In denying the Company's request to give the instruction as to the defense of truth, the judge said: "And the defense of truth, where a statement is obviously untrue; I have been unable to draw a close distinction between the matter of one being—one resigning and one being fired. I do not believe that this is substantially the same thing. I do not believe that it's a close enough question and I further believe that if a jury were to find otherwise, I would be required to set it aside."

14. This is borne out by the school board's minutes of October 8, 1957.

In the light of this evidence, which is at least conflicting, the trial court was mistaken in holding that whether plaintiff had voluntarily resigned or had been fired was not a "close enough question" for jury determination. The word "fired" means "to eject forcibly; to discharge from a position; to expel summarily." [15] The jury might well have concluded that this is precisely what happened to plaintiff, which would mean that the newspaper report of her being fired would have been found to be true.

An instruction on truth as a defense to the alleged defamatory publication ought to have been given. It was reversible error not to have done so.

## 2. *Libel Per Se.*

The Company claims error in the court's instruction that the following words, comprising the headlines of the 1957 article, were defamatory in themselves as a matter of law:

> "North Pole teacher fights Board. Territorial Police called to expel fired Schoolmarm. Dispute at outlying community finds teacher defying School Board; she is arrested for disorderly conduct."

■ For a publication to be libelous per se the words used must be so unambiguous as to be reasonably susceptible of only one interpretation—that is, one which has a natural tendency to injure another's reputation.[16] If the publication on its face shows that it is of that type, then the judge has the right to tell the jury that the words are defamatory. But if the language used is capable of two interpretations, one of which would be defamatory and the other not, then it is for the jury to determine which meaning would be given the words by those who read them.[17]

■ We cannot say the judge was wrong in instructing the jury as he did. A statement that a school teacher was engaged in a "fight" with her employer, that she was "fired", that the police were called to expel her, and that she was arrested for disorderly conduct, would have a natural tendency to diminish the esteem in which she was held and to result in a lack of confidence in her professional competency. The language was not ambiguous nor susceptible of an interpretation that would not tend to injure her reputation, and it was therefore unnecessary to submit to the jury the question of what ideas those words might have conveyed to those to whom they were communicated.

The instruction on what was defamatory per se dealt only with the headlines, and not with the article which followed. The Company argues that this was wrong because the headlines did not have a defamatory meaning when considered in the context of the entire publication.

We disagree. The ideas conveyed by the headlines were not explained away nor rendered innocuous by what was said in the article to which they referred. On the contrary, they were given greater emphasis; since the article developed in detail what was said in the headlines.

The Company also argues that the headlines could not be classified as libelous per se, because they did not identify the plaintiff as being the "teacher" or "schoolmarm" with whom the publication dealt. This argument has no merit. It depends for its validity upon the unreasonable assumption that one who had read the headlines would not have been interested enough to also scan the first few lines of the article where the plaintiff, Mrs. Elizabeth Pitka, was prominently identified as being

15. Webster, New International Dictionary (unabridged) at 951 (2d ed. 1960).

16. Fite v. Oklahoma Pub. Co., 146 Okl. 150, 293 P. 1073, 1075 (1930).

17. Washington Post Co. v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987, 989 (1919); Empire Printing Co. v. Roden, 247 F.2d 8, 13, 17 Alaska 209, 220, (9th Cir. 1957).

the person to whom the headlines referred.[18]

### 3. *Actual Malice—Punitive Damages*.

The court permitted the jury to consider whether actual malice had been proved. If so, they were authorized to award punitive damages, which they did in the amount of $19,000. The Company contends these instructions were erroneous.

In deciding the existence of actual malice, the jury was to determine whether the Company had been actuated by "ill will, enmity, hatred, spite or desire to injure the plaintiff in her fame, reputation or profession or to degrade, ridicule or disgrace her".[19] The record contains no direct evidence that the Company was motivated by any such purpose. Plaintiff concedes that. But she argues that what the Company published about her was alone sufficient to make actual malice an issue in the case. We disagree. After reading carefully all that was said about plaintiff and the events which gave occasion to the publications, we find there is nothing in what was said that reasonably created an inference of ill will, enmity, hatred, or desire to injure plaintiff in any manner.

Evidence of actual malice was totally lacking. That was not an issue to be submitted to the jury, and it was reversible error to do so. And since actual malice must exist before punitive damages may be awarded,[20] it was also reversible error to give an instruction permitting the jury to award such damages.

Finally, there was another publication which plaintiff claimed was defamatory. It was made a year later, on October 22, 1958. The News-Miner's main story of that day concerned the dismissal of the principal of the North Pole school. A rather lengthy article concluded on an inside page with the following:

"Ray wasn't the first head teacher to be fired by the board. In October, 1957 Mrs. Betty Pitka also departed by a similar route."

The court instructed the jury that this statement "must be considered as actionable libel",[21] and that "plaintiff is entitled to damages therefor".[22] The effect of these instructions was to tell the jury that those words were libelous per se, to eliminate truth as a defense, and to require that a verdict be returned in plaintiff's favor.

What was said here in substance was that plaintiff had been fired as head teacher by the North Pole School Board in October, 1957. Unlike the 1957 publication, this later report was not coupled with statements that plaintiff had also been arrested for disorderly conduct, that she was fighting with the school board and defying its wishes, and that she had been expelled from the school by the police. It was simply a statement that she had been fired. This is not defamatory as a matter of law. The right to hire implies the right to fire, and therefore a statement that the latter right has been exercised by one's employer does not necessarily have a tendency to injure or discredit the employee who has been discharged. There was here at least a question for the jury as to whether the publication was in fact understood by those to whom it was addressed in a sense which made it defamatory. It was error for the court to take this ques-

---

18. The first seven lines of the article, where plaintiff's name was mentioned twice, were printed in a type size considerably larger than the remainder of the article.

19. This was part of Instruction No. 9.

20. Berry v. Moench, 8 Utah 2d 191, 331 P.2d 814, 820, 73 A.L.R.2d 315 (1958). This is also clear from the instruction itself. The court said: "As to exemplary or punitive damages, you are instructed that if you find from a preponderance of the evidence that the articles were published with actual malice as I have hereafter defined that term, you may also award by way of exemplary or punitive damages as in your judgment should be fairly assessed against the defendant."

21. Instruction No. 5.

22. Instruction No. 6.

tion from the jury by holding the publication to be actionable libel.

It was also error for the court to eliminate truth as a defense to the alleged defamatory publication. That defense ought to have been available to the Company in this instance for the same reasons we have stated as to the 1957 publication.

By reason of the court's failure to give an instruction on truth as a defense to the 1957 and 1958 publications, in erroneously giving instructions on actual malice and punitive damages, and in erroneously stating that the 1958 publication was libelous in itself, the judgment must be reversed and a new trial ordered.

## II. *Plaintiff's Appeal.*

After all of the evidence was in, the court dismissed the action as to C. W. Snedden, president of the Fairbanks Publishing Company, a corporation. On her cross-appeal, plaintiff claims this was error.

■ The Company was owner and publisher of the News-Miner. Under rules of agency, it would be responsible for publication of defamatory statements made by an employee in the course of his employment.[23] Whether one in Snedden's position might also be held responsible is a question upon which different views have been expressed by other courts. The Supreme Court of Wisconsin has held that the president of a corporation that published a newspaper could be responsible if he were also the general or managing editor of the paper and in a position of control, and that this was a matter to be determined by the jury.[24] The Second Circuit has held one is not liable merely because he is president of a corporate publisher. But the court also held that such person could be responsible if, as editor of the paper, he had personally assisted in any manner in the preparation, revision or publication of the libel.[25]

The evidence in this case shows that Snedden was the major stockholder, president and general manager of the Fairbanks Publishing Company; that he was coordinator of the various departments of the newspaper; and that he was responsible for hiring and firing the department heads. He did not occupy the position of news editor, whose function it was to read and edit copy filed by the reporters, to write headlines, and to assign space in the paper. He was not the managing editor, who had the duty of scanning the first legible paper off the press and detect any errors that might appear. After the first papers came off the press, a copy would go to Snedden's desk. If he were available and free at the time he would scan it. But the majority of the time he did not have the opportunity to look at the paper until after the press run was completed. As to the article of October 21, 1957, Snedden testified that he did not see it until the evening of the day of publication. As to the article of October 22, 1958, he said he did not become familiar with it until the summer of 1959, since he had been out of town when it was published.

■ This evidence was not sufficient to raise a jury question as to Snedden's liability. He had no actual part in composing, editing or publishing the articles that plaintiff claims were defamatory. His duties were not such as to impose those responsibilities upon him. The court was correct in dismissing the action as to Snedden.

■ On this cross-appeal, plaintiff also claims as error the action of the court in giving certain parts of instructions 4 and 6 on portions of the October 21, 1957, publication which the court considered "conditionally privileged reports" and "conditionally privileged comments". Plaintiff does not point out, however, how she was prejudiced by these instructions. She was

23. Restatement (Second), Agency § 247 (1958).

24. Smith v. Utley, 92 Wis. 133, 65 N.W. 744, 35 L.R.A. 620 (1896). See also,

Faulkner v. Martin, 133 N.J.L. 605, 45 A.2d 596 (1946).

25. Folwell v. Miller, 145 F. 495 (2d Cir. 1906).

awarded substantial damages, she does not contend they were inadequate, and there was nothing in the record to indicate that the verdict would have been more favorable had those instructions not been given. In fact, plaintiff indicates complete satisfaction with the judgment in her favor. She does not demand a new trial on account of these alleged errors but instead asks us to pass upon those points only if the judgment is reversed in connection with the Company's appeal. Under these circumstances we assume that plaintiff has secured the full relief which she sought, and therefore has no standing to appeal from the judgment in her favor as to the instructions she claims to be erroneous.[26]

The judgment is reversed and the case remanded for a new trial.

ON PETITION FOR REHEARING

In both the 1957 and 1958 publications the Company stated that plaintiff had been "fired" as a school teacher. We held that it was error for the trial court not to give an instruction that truth would be a defense to that allegedly defamatory statement. In her petition for rehearing plaintiff claims that we were mistaken, since the Company had admitted in its answer to the complaint that plaintiff had not been fired. That is true; we acknowledge the mistake. The defense of truth ought to have been available to the Company only with regard to published statements, claimed by plaintiff to be defamatory, which the Company had not admitted were false.

We have reviewed other matters discussed in plaintiff's petition and conclude that there is nothing there which requires any further modification of our original opinion, or which constrains us to amplify it in any manner. The petition for rehearing is denied.

26. Annot., 69 A.L.R.2d 705 (1960).