Bishop C. Ewbank TUCKER, Appellant,

v.

Robert KILGORE, Appellee.

Court of Appeals of Kentucky.

Oct. 9, 1964.

As Modified on Denial of Rehearing
March 26, 1965.

Charles J. Lunderman, Jr., James A. Crumlin, Louisville, for plaintiff in error.

Harry S. McAlpin, Louisville, for defendant in error.

PALMORE, Judge.

Robert Kilgore, a Louisville policeman, brought this action against C. Ewbank Tucker, a bishop of the Zion Methodist Episcopal Church, for libel. He recovered $3,000 compensatory and $1500 punitive damages. The jury found against the bishop on his counterclaim for assault and battery. He appeals on the grounds that the evidence was insufficient to support the amount of the verdict and that the trial court erred in refusing to give an instruction on qualified privilege and in overruling his motion for a mistrial.

In December of 1961 the Alpha Phi Alpha Fraternity held a national convention at the Sheraton Hotel in Louisville. At the request of one or more of its officers the police department of the city assigned Patrolman Kilgore to duty at the hotel. Kilgore, a University of Louisville graduate, was a member of the fraternity. He had been on the city police force for 23 years. Bishop Tucker, who was not a member of the organization, came to the hotel and entered the room in which one of its meetings was being held. He was asked to leave and refused, whereupon Kilgore, who had been called to the scene, laid hold of him and escorted him out of the hotel. A week or so later the bishop distributed some 2,000 copies of the handbill that is the basis of Kilgore's complaint. It read as follows:

"NEGROES OF LOUISVILLE—WAKE UP—AND GET WISE TO THESE ORGANIZATIONS WHO LOOK DOWN WITH DERISION UPON THE MASSES OF THE PEOPLE.

"The Tea Sippers and pseudo-aristocrats have held their convention at the Sheraton Hotel—The Alpha Boys have departed, unwept, unhonored and unsung as far as the masses of Negroes

in Louisville are concerned—and we have got 'good riddance' of 'bad rubbish'.

"This Greek letter Fraternity—like others of its kind operates on the theory of the exclusion of what they term the 'common people'.

"Some of these society—crazy folk—members of the Alpha Phi Alpha Fraternity would not recognize a Greek letter if they saw it written in box car letters. Among them Robert Kilgore—of limited training, no culture and a professional moocher, who strikes you for 50c or a dollar every time he meets you on the streets. This man was used in an attempt to embarrass me at the Sheraton Hotel—without justification or warrant of law—illegally using his temporary authority as a policeman, and acting at the behest of his masters—in this phony race organization. I asked him to arrest me but he did not have the nerve to do so. C. Ewbank Tucker is never embarrassed when he fights for the Civil Rights of his people, and when he smokes out organizations like the Alpha Phi Alpha Fraternity which never made any contribution to the integration fight in Louisville. I shall continue to do so, and to fight until hell freezes over against any charlatan group that sets itself up as an aristocratic oligarchy.

"C. Ewbank Tucker,

"Presiding Bishop Ky. Conference of Methodist Episcopal Zion Church President of Louisville Chapter of the Congress of Racial Equality

Co-Chairman of the Integration Committee."

■ Published words are actionable per se if they directly tend to the prejudice or injury of any one in his profession, trade or business. Baker v. Clark, 186 Ky. 816, 218 S.W. 280, 283 (1920); Hill v. Evans, Ky., 258 S.W.2d 917 (1953); Restatement of Torts, § 569, Comment e. There is no question but that the references to Kilgore in the handbill were, in the absence of a valid defense, actionable per se. The two defenses pleaded by the bishop were truth and qualified privilege. The trial court instructed on the defense of truth but not on qualified privilege.

■ The significance of the defense of qualified or conditional privilege is that it removes the conclusive presumption of malice otherwise attaching to words that are actionable per se and thereby casts on the plaintiff a technical burden of proof in that respect. Thompson v. Bridges, 209 Ky. 710, 273 S.W. 529, 530 (1925); Tanner v. Stevenson, 138 Ky. 578, 128 S.W. 878, 882, 30 L.R.A.,N.S., 200 (1910). This does not require any greater degree of proof by the plaintiff, because the offensive character of the words still is sufficient by itself to support an inference of malice. The practical difference, therefore, is that in the one case the instructions do not require a finding of malice as a condition of recovery and in the other they do. Cf. McClintock v. McClure, 171 Ky. 714, 188 S.W. 867, Ann.Cas.1918E, 96 (1916).

"A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts which he in good faith proceeds to do." 33 Am.Jur. 124 (Libel and Slander, § 126). "Qualified privilege * * * comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has an interest, or in respect to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or

duty." 53 C.J.S. Libel and Slander § 89, pp. 143–144. See also Miller v. Howe, 245 Ky. 568, 53 S.W.2d 938 (1932), enumerating the requisites of the defense.

"The condition attached to all such qualified privileges is that they must be exercised *in a reasonable manner and for a proper purpose.* The immunity is forfeited if the defendant steps outside of the scope of the privilege, or abuses the occasion. Thus qualified privilege does not extend * * * to the publication of irrelevant defamatory matter with no bearing upon the public or private interest which is entitled to protection," etc. (Emphasis added.) Prosser on Torts (2d ed.), p. 625.

Bishop Tucker, for many years a prominent member of the bar in Louisville before his accession to the clerical office he now holds, has been a leader in advancing the cause of his people. Their interests being his interests, it may be assumed without argument that the activities of other persons and organizations in the same area provide the occasion for reasonable comment, criticism and warning by him to the members of his community. Even, however, had it been true (and the jury evidently found it was not) that Kilgore was a moocher, a common panhandler, what was the occasion for or proper purpose to be served by advertising it?

The bishop testified that during his practice of law Kilgore had approached him for money in return for suborning the absence of witnesses or for seeing to it that charges against his clients were dropped, that on more recent occasions he had solicited him (unsuccessfully) for small sums of money, and that he had a general reputation for such activities. As to his own motives, the bishop answered as follows:

"Q—Now, what was the purpose in having these handbills printed, Bishop?"

"A—My purpose in having these handbills printed was not out of malice to Mr. Kilgore as such, but I wanted the public to know just what was going on as it concerned Mr. Kilgore as a public officer in the City of Louisville, as far as I was concerned."

█ Still assuming that the charges had been true, the information imparted by them was long known to the bishop and, if Kilgore bore the general reputation ascribed to him by the bishop, was already known to the community as well. Hence there was no particular occasion for its publication at the time in question.

█ It might be argued that publication of the derogatory references to Kilgore was qualifiedly privileged incident to a good faith effort to show the Alpha Phi Alpha Fraternity in what Bishop Tucker considered to be its true light, as being composed of unworthy members. Conceding (without deciding) this to have been a proper purpose with a proper occasion, we are of the opinion that to single out an individual member of a large organization, particularly one who is not one of its officers or leaders, and expose him to public scorn transcends the scope of the privilege, because the means is unreasonably disproportionate to the end.

"One purveying such information about one person to protect another is obliged to consider the likelihood and the extent of benefit to the recipient, if the matter is true, as compared with the likelihood of injury and the extent thereof to the subject, if it prove false, or improper to reveal. Whether the privilege exists, depends upon generally accepted standards of decent conduct." Berry v. Moench, 8 Utah 2d 191, 331 P.2d 814, 818, 73 A.L.R.2d 315, 322 (1958).

█ In short, if there was a privileged occasion in this instance, our conclusion nevertheless is that Bishop Tucker's actions with respect to Kilgore were so clearly unfair and unreasonable as to constitute an abuse as a matter of law.

■ There is yet another reason why the bishop was not entitled to an instruction on qualified privilege. To the extent that he relied on his own knowledge of Kilgore's activities, truth was a complete defense, and if the jury believed him in that respect the further defense of qualified privilege was superfluous. On the other hand, if the jury did not believe the testimony based on his personal observations, the only evidence left to satisfy the requirements of good faith and reasonable grounds was his testimony regarding Kilgore's general reputation. When published as a fact, what one person has merely heard about another is not a sufficient foundation for the defense of qualified privilege. Miller v. Howe, 245 Ky. 568, 53 S.W.2d 938, 939 (1932). "It seems hardly necessary to state that one cannot pass on derogatory information indifferent to its truth, or the consequences thereof, but failure to exercise reasonable care and diligence to ascertain the truth destroys the privilege." Berry v. Moench, 8 Utah 2d 191, 331 P.2d 814, 73 A.L.R.2d 315, 323 (1958).

Thus the references in the handbill either were the truth or they lacked sufficient basis to support a claim of privilege.

We are of the opinion that the trial court did not err in refusing to instruct on qualified privilege.

■ Citing the recent case of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964), Bishop Tucker invokes the protection of the 1st Amendment of the U. S. Constitution, which "delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct" by requiring proof (beyond the inference naturally arising from the offensive character of the words themselves) of actual malice. That Kilgore was a policeman, however, was no more than a coincidental circumstance in the attack made upon him by the bishop. That attack was directed not at Kilgore's official conduct as a policeman, but at his fitness and character as a man, exemplifying the low quality of Alpha Phi Alpha, the real object of the tirade. It is obvious from the contents of the pamphlet that it was not aimed at governmental oppression. Its object was to vilify a rival organization, and this purely personal attack on Kilgore was a handy means to that end. The freedom of "uninhibited, robust, and wide-open" debate on public issues guaranteed by the 1st Amendment cannot sensibly be turned into an open season to shoot down the good name of any man who happens to be a public servant.

■ Kilgore did not prove any damages, but when the defamatory publication is actionable per se there is a conclusive presumption of both malice and damage. Baker v. Clark, 186 Ky. 816, 218 S.W. 280 (1920).

"In cases of defamation the courts tenaciously hold the parties to the damages found by the jury, because there is no scale by which the damages can be graduated with certainty and they admit of no other tests than the intelligence of the jury governed by a sense of justice." Annotation, "Excessiveness or inadequacy of damages for defamation," 35 A.L.R.2d 218, 222, quoting Davenport v. Armstead, Mo.App., 255 S.W.2d 132 (1952). See Miller v. Woods, Ky., 338 S.W.2d 412, 413 (1960), and Restatement of Torts, § 569.

■ No proof of damage was necessary, and we do not regard the verdict as excessive.

During the trial Kilgore suffered some kind of physical collapse and was not present at the end. The only contemporaneous reference in the record to the occurrence is the reporter's notation of counsel's motion that the court "discharge the Jury and declare a mistrial in view of the sudden fainting of Officer Kilgore which we feel if communicated to the Jury might cause

them to be sympathetic with the Officer and his side of the case." The motion was overruled, and the same ground was stated in support of a subsequent motion for new trial.

Matters of fact stated only in a motion and grounds for new trial cannot be considered on appeal, because the trial court's certification of the record does not establish their authenticity. Senibaldi v. Commonwealth, Ky., 338 S.W.2d 915, 919 (1960); Equitable Life Assur. Soc. of United States v. Fannin, 252 Ky. 600, 67 S.W.2d 964, 966 (1934); Belcher v. Sandy Valley & E. Ry. Co., 207 Ky. 560, 269 S.W. 729, 731 (1925). The same is true with regard to the contents of any other motion. They are simply allegations. The trial court did not direct the reporter to record what had happened, nor did he cause it to be verified by some other appropriate entry in the record. In the briefs one party says it happened in the presence of the jury and the other says it did not, but the point is that there is no way for this court to know. We must therefore presume that there was no error.

The judgment is affirmed.