**Reem HADDAD, Appellant**

v.

**Tirun A. GOPAL, M.D., Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 25, 2001.

Filed Nov. 14, 2001.

Reargument Denied Jan. 17, 2002.

Richard J. Orloski, Allentown, for appellant.

Sheila A. Haren, Allentown, for appellee.

Before: HUDOCK, STEVENS, and OLSZEWSKI, JJ.

OLSZEWSKI, J.

¶1 Reem Haddad appeals from the judgment entered September 15, 2000. We affirm.

Haddad came to the United States from Damascus, Syria in September 1993. She met her husband Nezar one year later, in February 1994 when she was twenty-three and he was thirty-five years old. He was born in Beirut, Lebanon and came to the United States in 1968, when he was eleven years old. Because of their cultural backgrounds, and to accommodate possible concerns of her parents, they were married twice, once in a civil ceremony on March 21, 1994 and once in a church ceremony on July 10, 1994. They considered the period between the civil ceremony and church wedding as an engagement period. They did not live together or engage in a sexual relationship until after the church ceremony.

Shortly thereafter, Haddad began experiencing pain during intercourse. She told Nezar of the pain, and they decided to seek medical attention. Nezar, with her knowledge, initiated a telephone call to [appellee] Dr. Tirun Gopal's office. He explained the nature of Haddad's physical problems and requested an appointment for her. An appointment was arranged for July 13, 1994. This would be Haddad's first visit to a gynecologist.

Nezar accompanied Haddad to her July appointment. He and a nurse remained in the examination room the entire time Haddad was seen by Dr. Gopal, a board-certified obstetrician-gynecologist for twenty-three years. Nezar observed Dr. Gopal performing her pelvic examination. Both Nezar and Haddad participated in a discussion with Dr. Go-

pal concerning the use of contraceptives. Dr. Gopal did not ask Nezar to leave the room, nor did Nezar ask to be excused. Moreover, Haddad did not ask her husband, the nurse, or Dr. Gopal to have Nezar leave the room during the examination or discussion.

Dr. Gopal diagnosed Haddad as having pelvic inflammatory disease and gave her Amoxicillin. Haddad did not see Dr. Gopal again for the remainder of the year.

In May of 1995, Haddad returned to Syria for two months to visit with her family. Nezar remained at their home in State College, Pennsylvania, to perform research and laboratory work at Penn State University. Haddad returned to the U.S. on or about August 2, 1995. Nezar went to New York's JFK Airport to meet her. They had planned to return directly to Pennsylvania, passing through Allentown to visit Nezar's parents on their way to Penn State, but instead decided "to spend a few days in a hotel" in New Jersey for a "second honeymoon." Nezar testified,

> We checked into a Holiday Inn, and we had sexual intercourse quite a bit. And on the second day [Haddad] started to complain of pain whenever we would initiate sexual intercourse, and that pain became more intense.

With Haddad's knowledge and agreement, Nezar placed a telephone call to Dr. Gopal's office, and explained Haddad's medical problem. Dr. Gopal agreed to meet them in the emergency room at the hospital on Sunday morning, August 6, 1995.

Dr. Gopal examined Haddad in a gynecologic examination room in the emergency department of Lehigh Valley Hospital. Nezar and a nurse were present during the examination. Dr. Gopal took cultures to test Haddad for three sexually transmitted diseases. He told Haddad and Nezar that he would discuss the results of the cultures when he received them. He gave Haddad an antibiotic to treat what he suspected was another case of pelvic inflammatory disease. Dr. Gopal also gave her a combination of Zovirax capsules and Zovirax cream for local application. At this point, Nezar started questioning Dr. Gopal as to the nature of his wife's problem. Dr. Gopal tried to evade Nezar's questions, and said they should wait for the results of the cultures, as he wanted to have the culture results on hand prior to discussing it further with the couple. According to Dr. Gopal, Nezar continued to ask more questions about his suspected diagnosis. Dr. Gopal explained,

> [t]hen he asked me, but you must have an idea what is going on. What do you think it is? I then said to him that there are some other possibilities, but the most likely one is herpes, because she has large, very painful sores.

Nezar called Dr. Gopal's office repeatedly after Haddad's examination. He was on the telephone on August 24, 1995, with a nurse requesting the test results when Dr. Gopal was handed the lab sheet, at that point Dr. Gopal took Nezar's call. He told Nezar the cultures were negative, but cautioned the results could be misleading; the accuracy of a herpes culture is higher when it is taken immediately after symptoms appear, and Haddad's culture was taken a few days after the onset of symptoms. Dr. Gopal advised Nezar that Haddad was to be seen and tested as soon as symptoms appeared the next time so they could again take cultures.

Haddad claims that shortly after she and Nezar received the diagnosis of herpes her marriage relationship turned "upside down." Nezar began to physically and verbally abuse her and she went to a shelter seeking help. She was

afraid she would lose their four-year old son, Fuad, if she sought protection from Nezar. She was also enduring abuse from her in-laws. She thereupon filed [an] action against Dr. Gopal claiming breach of doctor-patient confidentiality, intentional infliction of emotional distress, and tortious interference with marital relations. At the conclusion of a jury trial on August [ ] 29, 2000, the jury found in favor of Dr. Gopal and against Haddad in no amount.

Trial Court Opinion, 2/13/01, at 1–5. This appeal followed.

¶ 2 Appellant raises the following issues for review:

> I. Did the [trial] court err by determining that a patient can *ever* impliedly "impliedly" [sic] consent to the release of confidential medical information to a third person, and charging the jury on that issue?
>
> \*     \*     \*
>
> ■■■■ II. Did the [trial] court err by refusing to enter judgment notwithstanding the verdict in light of [appellee's] admission that he did not have [appellant's] explicit consent to release confidential medical information about her to her husband?
>
> III. Did the trial court err by determining that there is no cause of action for tortious interference with the marital relationship?

Brief of Appellant at 3 (full capitalization omitted).

When reviewing the propriety of an order denying judgment notwithstanding the verdict, this Court must determine whether there is sufficient competent evidence to sustain the verdict. *Birth Center v. St. Paul Companies, Inc.*, 727 A.2d 1144 (Pa.Super.1999). We must review the evidence in the light most favorable to the verdict winner and give the verdict winner the benefit of every reasonable inference arising

therefrom while rejecting all unfavorable testimony and inferences. *Id.* at 1154. A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict.... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact.... A JNOV should be entered only in a clear case. Our review of the trial court's denial of a new trial is limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. In making this determination, we must consider whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Consequently, if there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed. *Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 304–305 (Pa.Super.1999) (internal citations omitted). The scope of review in deciding whether or not a trial court erred in not granting a new trial is broader than when we pass on whether or not a denial of judgment n.o.v. was an abuse of discretion. Here we must consider all of the evidence. Only when the verdict is so contrary to the evidence so as to shock one's sense of justice should a new trial be granted, however. We will not reverse the decision of the trial court in refusing to grant a new trial

unless there has been a clear abuse of discretion or an error in law determinative to the outcome of the case.

*Price v. Chevrolet Motor Div. of General Motors Corp.*, 765 A.2d 800, 806–07 (Pa.Super.2000). Appellant brought this civil action against appellee alleging a breach of doctor-patient confidentiality, intentional infliction of emotional distress,[1] and tortious interference with marital relations. The trial court dismissed the tortious interference with marital relations claim (discussed below), but permitted the case to proceed on the assumption that Pennsylvania law recognized a civil cause of action for breach of physician-patient confidentiality. Trial Court Opinion, 2/13/01, at 5 n. 5, (citing *Moses v. McWilliams*, 379 Pa.Super. 150, 549 A.2d 950 (1988) (en banc)). We agree.

¶ 3 In *Moses*, this Court addressed the question of whether a patient stated a cause of action for breach of confidentiality based on her treating physician's unauthorized and judicially unsupervised communications with the patient's adversary in a pending medical malpractice action. *Id.* Although not directly on point, we stated that in some cases a civil claim for a physician's breach of confidentiality is cognizable. *Id.* at 953. In *Moses* we rejected the appellant's breach of confidentiality claim based solely on its "narrow factual context," specifically writing, "we will not recognize the cause of action for breach of confidentiality *as pled in this case.*" *Id.* at 954 (emphasis added).

■■■ ¶ 4 The present case, however, does allege facts establishing a valid claim for breach of physician-patient confidentiality. As we noted in *Moses:*

> [A] majority of jurisdictions that have considered the broad issue of whether to recognize a general cause of action for a physician's breach of confidentiality have

allowed such a claim. However, our research has revealed no court from any jurisdiction that has allowed recovery against a physician for breach of confidentiality under facts similar to those alleged in this case. *See, e.g., Hague v. Williams*, 37 N.J. 328, 181 A.2d 345 (1962); *Fedell v. Wierzbieniec, M.D.*, 127 Misc.2d 124, 485 N.Y.S.2d 460 (1985). When the cause of action has been recognized, it is in cases where there have been *extra-judicial* disclosures of confidential information or in cases, such as those involving custody, where the plaintiff's physical condition has not been in issue. See, e.g., *Horne v. Patton*, 291 Ala. 701, 287 So.2d 824 (1974) (physician disclosed confidential information to plaintiff's employer); *MacDonald v. Clinger*, 84 A.D.2d 482, 446 N.Y.S.2d 801 (1982) (psychiatrist revealed confidential information to plaintiff's wife); *Doe v. Roe*, 93 Misc.2d 201, 400 N.Y.S.2d 668 (1977) (psychiatrist, without plaintiff's consent, published a book containing verbatim accounts of plaintiff's feelings); *Schaffer v. Spicer*, 88 S.D. 36, 215 N.W.2d 134 (1974) (in a custody case, psychiatrist gave to the attorney of the patient's ex-husband an affidavit containing information with regard to his patient's mental health, which was deemed inadmissible at hearing); *Berry v. Moench*, 8 Utah 2d 191, 331 P.2d 814 (1958) (doctor revealed information about plaintiff to another doctor for the purpose of conveying the information to the parents of a woman contemplating marriage to plaintiff).

*See id.* at 953 n. 4. Appellant contends appellee breached the physician-patient confidentiality by disclosing to her husband that she contracted a venereal disease. Appellant claimed, as a result of this disclosure, her marriage broke down, dis-

---

1. The claim of intentional infliction of emotional distress is not on appeal.

integrating any semblance of the prior relationship. She subsequently filed this action.

¶ 5 These facts are analogous to the above-cited cases from other jurisdictions recognizing such claims. *See above.* In all of those cases, confidential disclosures occurred that were unrelated to any judicial proceedings. Doctors have an obligation to their patients to keep communications, diagnosis, and treatment completely confidential. Especially when, as in this case, a sexually transmitted disease is in issue. Pennsylvania courts, in fact, recognize loathsome disease in defamation suits as actionable *per se* without special proof of harm because of their highly sensitive nature. *Agriss v. Roadway Exp. Inc.,* 334 Pa.Super. 295, 483 A.2d 456, 470 (1984).

¶ 6 Patients, further, are aware of the promises of discretion contained in the Hippocratic Oath and must be able to rely on those promises. Appellant had a physician-patient relationship with appellee. Appellee, through that relationship, attained highly sensitive, confidential information about appellant unrelated to any litigation. Appellee, in turn, disclosed that information to appellant's husband without her consent. The circumstances of this case sufficiently support the trial court's decision to allow the case to proceed as an action for breach of physician-patient confidentiality.

¶ 7 Our analysis, however, does not end there; we must also decide whether a patient's conduct can result in "implied consent" to disclose confidential information to a third party. We hold that in limited circumstances, based on an objective review of the totality of the circumstances, a patient's conduct may result in implied consent to disclose confidential information. Such consent also serves as an affirmative defense to an action for breach of physician-patient confidentiality.

¶ 8 This Commonwealth recognizes implied consent for jurisdiction, *Wagner v. Wagner,* 564 Pa. 448, 768 A.2d 1112, 1115 (2001); motor vehicle operator's test for chemical substances, *Commonwealth v. Shaw,* 564 Pa. 617, 770 A.2d 295, 298 (2001); contributory negligence, *Hughes v. Seven Springs Farm, Inc.,* 563 Pa. 501, 762 A.2d 339, 342 (2000); severance of an estate, *Fazekas v. Fazekas,* 737 A.2d 1262, 1264 (Pa.Super.1999); limited investigatory search, *Commonwealth v. Witman,* 750 A.2d 327, 335 (Pa.Super.2000); breach of bank-depositor confidentiality, *McGuire v. Shubert,* 722 A.2d 1087, 1091 (Pa.Super.1998); and in civil proceedings to release medical records when placing treatment in issue, *Moses,* 549 A.2d at 958.

¶ 9 As in the aforementioned cases, we recognize that one can impliedly consent to disclosure of confidential medical information. It is, therefore, a physician's duty to obtain either express or implied consent prior to releasing confidential information to third parties. Failure to do so will result in civil liability.

¶ 10 The facts presented at trial established that appellant's husband made all the appointments with appellee, but, more importantly, that he was present for her gynecological examinations. N.T. Trial, 8/28/00, at 66. Appellant made no efforts to exclude him from the examinations or the discussions about her diagnosis and treatment. *See id.* at 69–70. Appellant, based on the totality of the circumstances, gave implied consent to have her medical information released to her husband. We do not deny it is somewhat disturbing that appellee carried the consent forward to the release of test results, over the phone, weeks later. This jury, however, believed the physician possessed a general implied consent to release all information to her husband pertaining to any diagnosis. We will not disturb the jury's finding absent

egregious error. Reviewing the evidence and the court's instruction on implied consent, we find no error.

■ ¶ 11 Appellant also alleges that the trial court erred for failing to permit a cause of action for tortious interference with marital relations. Appellant cites *Tiburzio–Kelly v. Montgomery*, 452 Pa.Super. 158, 681 A.2d 757 (1996), as authority for the trial court to recognize a cause of action for tortious interference with the marital relationship. We disagree. We now state for clarity, tortious interference with the marital relationship is abolished in Pennsylvania.[2] The tort was based on a claim for alienation of affections or for criminal conversation. *Fadgen v. Lenkner*, 469 Pa. 272, 365 A.2d 147, 149 n. 4 (1976). The legislature abolished alienation of affections, 23 Pa.C.S. § 1901(a), stating "[a]ll civil causes of action for alienation of affections of husband or wife are abolished." Although criminal conversation was originally excluded from the statute, *see Antonelli v. Xenakis*, 363 Pa. 375, 69 A.2d 102 (1949), it too was later abolished by our Supreme Court in *Fadgen*, 365 A.2d at 151. Thus, the trial court properly ruled that there was no cause of action for tortious interference with marital relations.

¶ 12 We therefore affirm the trial court's order denying appellant's post trial motions and the judgment entered in favor of appellee.

¶ 13 Judgment affirmed.

---

2. This opinion in no way affects the right to recover for loss of consortium as a factor in assessing damages in a personal injury suit.