J-S10016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JACQUELINE SCHWEIGART | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEVIN SCHMALENBERGER, M.D. AND | : | No. 1226 MDA 2020 |
| WEST SHORE ANESTHESIA | : | |
| ASSOCIATES | : | |

Appeal from the Order Dated August 19, 2020
In the Court of Common Pleas of Cumberland County Civil Division at
No(s): 2015-06598

BEFORE:   MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED JULY 02, 2021**

Jacqueline Schweigart appeals from the order granting summary judgment in favor of Kevin Schmalenberger, M.D., and West Shore Anesthesia Associates ("West Shore"). We affirm.

The trial court set forth the factual and procedural history, which we incorporate herein. Trial Ct. Op., filed Aug. 19, 2020, at 1-3 ("1925(a) Op."). We will briefly summarize the facts. Schweigart underwent hip replacement surgery at Holy Spirit Hospital in December 2013. Dr. Schmalenberger, an employee of West Shore Anesthesia Associates, was her anesthesiologist. At some point after she woke up, Schweigart looked on her phone and saw that someone had sent her a photograph of herself. The photograph was taken

_____

[*] Retired Senior Judge assigned to the Superior Court.

before surgery and depicted her lying on her back in her hospital bed, in a hospital gown, looking at the camera and sticking her tongue out at the photographer. She tried calling the phone number that had sent the message. Dep. of Schweigart, N.T., 12/27/18, at 46. No one answered the phone, the answering message did not identify the phone's owner, and she did not leave a message. *Id.* at 46-47. She later learned Dr. Schmalenberger had sent the picture. Dr. Schmalenberger testified at his deposition that he sent the picture, as it was sent from his phone number, but he does not remember doing so. Dep. of Schmalenberger, N.T., 5/13/19, at 12, 14. He further testified that he has in the past taken photographs of patients and sent the photograph to the patient's phone when the patient has requested. *Id.* at 22. When he has done this, he has immediately deleted the photograph from his phone after sending it. *Id.*

Schweigart instituted this suit in December 2015, and in her Amended Complaint asserted claims of negligence, invasion of privacy, intentional infliction of emotional distress, breach of physician-patient confidentiality, and gross negligence. In the negligence count, Schweigart alleged Dr. Schmalenberger owed a duty of care to his patient Schweigart, breached that duty by taking and sending the photograph, and the breach caused harm. Schweigart did not file a certificate of merit, but rather a certificate stating, "the expert testimony of a Licensed Professional is unnecessary for prosecution of the claim(s) raised in the Complaint." Certificate of Counsel, filed Nov. 29, 2016. In the breach of physician-patient confidentiality count,

Schweigart alleged Dr. Schmalenberger took the unauthorized photograph, anonymously sent it to Schweigart, transmitted it "using a series of cellular networks, wifi-networks that were both closed and open," and still possessed the photograph. Complaint at ¶¶ 42-44.

Schweigart claims that as a result of receiving the photo, she is afraid to leave her home and no longer does activities that she used to enjoy. She stated that she is afraid that Dr. Schmalenberger "would put her to sleep and I'd never wake up again." Dep. of Schweigart, N.T., 12/27/18, at 77. She is medicated for depression and attends counseling. Plaintiff has a history of head and neck injuries, spine surgery, hip replacement, shoulder surgery, frequent headaches, Lyme disease, and was previously treated for depression with medication. She sustained injuries in a car accident that occurred in 1986 that resulted in her receiving Social Security disability payments since around 1986.

Following discovery, Appellees filed a motion for summary judgment, which the trial court granted. Schweigart filed a notice of appeal.

Schweigart raises the following issues:

> 1. Whether the trial court abused its discretion and otherwise committed an error of law when it granted [Appellants'] motion for summary judgment as to Count I - Negligence on the grounds that expert testimony of a Licensed Professional is necessary for prosecution of the claim and determining the specific cause of [Schweigart's] medical conditions in this case will require the finder of fact to thoroughly examine [Schweigart's] medical records and determine the cause of each and every diagnosis, something that is neither simple nor obvious, and thus beyond the

scope of the exception to the medical expert requirement, when [Schweigart] posits that normal 'expert' testimony is not necessary as the conduct of [Dr. Schmalenberger] is so far outside the standard of care that her testimony would be sufficient to establish each and every element of negligence, and when it is clear that Ms. Schweigart has a lengthy medical history and per her deposition, she possesses more expertise of her condition and its toll upon her than the ordinary range of experience, and when the actions of [Dr. Schmalenberger] on their face are a breach of the standard of care due any patient of a physician or their employer.

2. Whether the trial court abused its discretion and otherwise committed an error of law when it granted [Appellants'] motion for summary judgment as to Count IV - Breach of Physician-Patient Confidentiality on the grounds by stating that it did not subscribe to [Schweigart's] belief that someone could have intercepted the photo through open wifi or cellular networks, when Ms. Schweigart has clearly stated how she was damaged by the photo being taken and then anonymously transmitted to her while she lay alone in a recovery room.

3. Whether the trial court abused its discretion and otherwise committed an error of law when it granted [Appellants'] motion for summary judgment as to Count III - Intentional Infliction of Emotional Distress on the grounds that Schmalenberger's actions were hardly outrageous or extreme "beyond all bounds of decency." When [Schweigart] can prove, by her own testimony a causal link between the photographs and the fear, apprehension, terror and emotional damage she suffered immediately after and continues to suffer as a direct result of [Dr. Schmalenberger's] actions and inaction.

4. Whether the trial court abused its discretion and otherwise committed an error of law when it granted [Appellants'] motion for summary judgment as to Count V - Gross Negligence and punitive damages on the grounds that [Schweigart] "cannot show that [Dr.] Schmalenberger acted with the state of mind necessary to show gross negligence, let alone recklessness...that there were simply too many unknowns", when Ms. Schweigart has established at minimum that some of the injuries complained of are a direct result of the actions or inactions of [Dr.

Schmalenberger] while she was under their sole care and concern.

5. Whether the trial court abused its discretion and otherwise committed an error of law when it granted [Appellants'] motion for summary judgment as to the claims against Defendant West Shore Anesthesia Associates on the grounds that they have dismissed all claims against [Dr.] Schmalenberger, and therefore must also dismiss them against Defendant West Shore Anesthesia Associates.

Schweigart's Br. at 5-6.

We review the grant of summary judgment for errors of law and abuse of discretion. *See In re Risperdal Litig.*, 223 A.3d 633, 639 (Pa. 2019). "[S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Id.* "The trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party" and "must resolve all doubts as to the existence of a genuine issue of material fact against the moving party." *Id.* The court "may only grant summary judgment where the right to such judgment is clear and free from all doubt." *Id.*

Schweigart first challenges the grant of summary judgment as to her negligence claim. She claims expert testimony was not necessary for the prosecution of her claim. She contends that Dr. Schmalenberger's conduct was "so far outside the standard of care that her testimony would be sufficient to establish each and every element of negligence." Schweigart's Br. at 11. Schweigart claims Dr. Schmalenberger's actions "on their face are a breach of the standard of care due any patient of a physician or their employer" and she

- 5 -

"can prove, by her own testimony, a causal link between the photograph being taken and transmitted to her and the emotional damage she suffered immediately after and continues to suffer as a direct result of [Dr. Schmalenberger's] actions and inaction." *Id.* at 14-15.

Schweigart has claimed medical malpractice. "Medical malpractice consists of a negligent or unskillful performance by a physician of the duties which are devolved and incumbent upon him on account of his relations with his patients, or of a want of proper care and skill in the performance of a professional act." *Fessenden v. Robert Packer Hosp.*, 97 A.3d 1225, 1229 (Pa.Super. 2014) (quoting *Quinby v. Plumsteadville Family Practice Inc.*, 907 A.2d 1061, 1070 (Pa. 2006)). Such a claim implicates the elements of negligence: duty, breach (sometimes called the negligence prong), causation, and damages. *Id.*

In all but the most self-evident medical malpractice actions, the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation. *Id.* (citing *Quinby*, 907 A.2d at 1070-71). A narrow exception to this requirement "applies in instances of obvious negligence, *i.e.*, circumstances in which the medical and factual issues presented are such that a lay juror could recognize negligence just as well as any expert." *Id.* at 1230 (citing *Jones v. Harrisburg Polyclinic Hosp.*, 437 A.2d 1134, 1137 (Pa. 1981)). "In such instances, the doctrine of *res ipsa loquitur* allows a fact-finder to infer from the circumstances surrounding the injury that the harm suffered was caused by the negligence of the defendant." *Id.*

For *res ipsa loquitur* to apply, three conditions must exist: (a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff. ***Id***. Where *res ipsa* applies, it permits the jury to infer negligence and causation. ***Id.***

Schweigart asserted that the doctrine *res ipsa loquitur* obviated the need for expert testimony. The trial court disagreed. It concluded that a lay jury would be unable to determine, in the absence of expert testimony, that Dr. Schmalenberger's conduct constituted negligence. 1925(a) Op. at 6. It further noted that Schweigart's injuries included "physical pain, distress, and emotional damage," but she had an extensive medical history and no expert to testify regarding the cause of each of her diagnoses. ***Id.*** at 5-6.

We perceive no error in the grant of summary judgment. At the very least, Schweigart will need an expert to prove causation. The injuries she claims are not of the sort that a lay jury can determine resulted from the alleged negligence, without expert help.[1]

Although not included in her statement of questions involved, in the argument section of her brief, Schweigart next asserts the court erred in

---

[1] ***Toogood v. Owen J. Rogal, D.D.S.***, 824 A.2d 1140 (Pa. 2003) (opinion announcing judgment of the court), which the trial court cited, is a plurality opinion, and not binding precedent. ***See Quinby v. Plumsteadville Family Practice, Inc.***, 907 A.2d 1061, 1070 n.14 (Pa. 2006).

granting summary judgment as to her claim for invasion of privacy – intrusion upon seclusion. She argues that the evidence she presented met the elements for such a claim.

Schweigart waived this issue by not including it in her statement of questions involved. *See* Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").[2] Moreover, the trial court dismissed the claim because Schweigart commenced suit after the statute of limitations had expired. *See* 1925(a) Op. at 6-7; 42 Pa.C.S.A. § 5523(1) (providing an action for invasion of privacy "must be commenced within one year"). Schweigart makes no argument on appeal that the court erred in reaching that conclusion. Therefore, even if she had included this issue in the statement of questions involved, we would nonetheless affirm the trial court.

Schweigart next claims the court erred in granting summary judgment as to her breach of physician-patient confidentiality claim. She argues that "[b]y taking a photograph of Ms. Schweigart for a purpose unrelated to any medical treatment or diagnosis and then at a minimum saving said photo to his phone, in addition to transmitting the same to [Schweigart] anonymously, is a breach of" the physician-patient relationship. Schweigart's Br. at 17. She claims that, although Dr. Schmalenberger does not recall taking and

---

[2] *See* Pa.R.A.P. 2119; ***Burgoyne v. Pinecrest Cmty. Ass'n***, 924 A.2d 675, 680 n.6 (Pa.Super. 2007) (the failure to develop an argument with citation to and analysis of relevant authority waives the issue on appeal).

transmitting the photograph, "the only reason could be to invade the psyche of Ms. Schweigart to which the blackening of her character occurs as she must now wonder why for some unknown reason, she was chosen to be the victim of [Dr. Schmalenberger's] unauthorized actions." *Id.* at 18.

In Pennsylvania, "in some cases a civil claim for a physician's breach of confidentiality is cognizable." *Haddad v. Gopal*, 787 A.2d 975, 980 (Pa.Super. 2001). "Doctors have an obligation to their patients to keep communications, diagnosis, and treatment completely confidential." *Id.* at 981. In *Haddad*, we noted that courts have recognized a physician breach of confidentiality claim where "confidential disclosures occurred that were unrelated to any judicial proceedings." *Id.*; *See Moses v. McWilliams*, 549 A.2d 950, 953 n.4 (Pa.Super. 1988) (discussing cases from other jurisdictions that recognized a breach of confidentiality claim where there were extra-judicial disclosures of information).

The trial court granted summary judgment because no "disclosure" of confidential information occurred in this case. 1925(a) Op. at 8-9. The trial court explained that Dr. Schmalenberger sent the photograph only to Schweigart, and Schweigart does not allege he sent it to others, submitted it for publication, or posted it on social media. *Id.* at 9. The court further rejected Schweigart's claim someone could have intercepted it through open wifi or cellular networks. *Id.* After a review of the briefs, the trial court record, the relevant law, and the trial court opinion, we affirm on the basis of the trial court opinion. *Id.* at 7-9.

Schweigart next argues the court erred in granting summary judgment as to her intentional infliction of emotional distress claim. She claims the facts reveal that Schmalenberger's "conduct was certainly outrageous." Schweigart's Br. at 18. She notes Dr. Schmalenberger does not deny taking the photograph, and she stated that he sent it to her without explanation and without identifying himself. She further claims that Dr. Schmalenberger's "intent can be inferred by examining the backs of everyone else in the photograph being turned away from the camera." *Id.* She states that "given her post-operative state, [Schweigart] was immediately physically impacted in terms of the immediate fear, terror, loss of sleep and being left to wonder all night if someone was stalking her in the hospital or coming for her in the recovery room as she lay alone in her bed post hip replacement." *Id.* at 19.

"The gravamen of the tort of intentional infliction of emotional distress is outrageous conduct on the part of the tortfeasor." *Gray v. Huntzinger*, 147 A.3d 924, 927 (Pa.Super. 2016) (quoting *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987)). "[A] plaintiff must prove that the defendant 'by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress.'" *Id.* (quoting *Kazatsky*, 527 A.2d at 991).

Here, the trial court granted summary judgment, finding "Dr. Schmalenberger's actions were hardly outrageous or extreme 'beyond all bounds of decency.'" 1925(a) Op. at 11. After a review of the briefs, the trial

court record, the relevant law, and the trial court opinion, we affirm on the basis of the trial court opinion. ***See id.*** at 9-11.

Schweigart also claims the court erred in dismissing her request for punitive damages. She alleges that she set forth facts that her anesthesiologist took an unsolicited and unauthorized photograph of her and anonymously sent it to her. She further claims that she then "inquired of the person sending her the photo of herself and [was] again met with deafening silence." Schweigart's Br. at 20. She asserts that, viewed in the totality, the "conduct . . . was an egregious deviation from the standard of care to evince a conscious and or reckless disregard of a patent risk of harm to Ms. Schweigart." ***Id.***

Although the claim in the Complaint is entitled "gross negligence," Schweigart is in effect requesting punitive damages, and, in her brief, claims the court erred in dismissing her claim for punitive damages. ***Id.*** at 19.

As stated above, the trial court did not err in granting summary judgment as to her negligence, invasion of privacy, breach of physician/patient confidentiality, and IIED claims. Therefore, any claim for punitive damages must also fail. ***See Judge Tech. Servs. v. Clancy***, 813 A.2d 879, 888) (Pa.Super. 2002) ("[i]f no cause of action exists, then no independent action exists for a claim of punitive damages since punitive damages is only an element of damages") (quoting ***Kirkbride v Lisbon Contractors, Inc.***, 555 A.2d 800, 802 (Pa. 1989)). Further, the trial court found that there was nothing in the record to support Schweigart's claim that

Dr. Schmalenberger "acted with the state of mind necessary to show gross negligence, let alone recklessness." 1925(a) Op. at 14. We agree and conclude the court did not err in granting summary judgment.

Schweigart also argues the trial court erred when it granted summary judgment in favor of West Shore.[3] The trial court pointed out that the claims against West Shore were for vicarious liability, and as it had "dismissed all claims against [Dr.] Schmalenberger, [it] must also dismiss them against . . . West Shore." *Id.* at 15.

We agree. Because summary judgment properly was entered for all claims against Dr. Schmalenberger, and Schweigart does not assert an independent claim against West Shore, the trial court did not err in granting summary judgment as to the claims against West Shore.

---

[3] The sole mention of this claim after the statement of questions involved is in the summary of the argument section. Schweigart makes no mention of it in the argument section of this brief. Although we could find the claim waived for failure to develop the argument, we will address it, as the trial court has done so.

Order affirmed.

Judge Murray joins the memorandum.

Judge Pellegrini concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/2/2021

JACQUELINE SCHWEIGART,
      Plaintiff

    v.

KEVIN SCHMALENBERGER, M.D. and
WEST SHORE ANESTHESIA ASSOC.,
      Defendants

: THE COURT OF COMMON PLEAS
: CUMBERLAND COUNTY, PENNSYLVANIA
:
:
: No. 2015-06598 CIVIL TERM
:
:
:
:
: CIVIL ACTION - LAW

## OPINION
## IN RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Smith, J., August 19, 2020**

## FACTS

    The undisputed facts of this case are as follows. On December 18, 2013, Plaintiff arrived at Holy Spirit Hospital for hip replacement surgery. While she was in a "holding area" waiting to be wheeled into the operating room, she was approached by Defendant Schmalenberger, who introduced himself as her anesthesiologist. Defendant Schmalenberger was an employee of Defendant West Shore Anesthesia Associates and working in his official capacity. At the time, Plaintiff was lying in a hospital bed in a hospital gown. Defendant Schmalenberger asked her a number of questions related to her medical conditions and explained the procedure of undergoing general anesthesia. According to the parties and Plaintiff's medical records, this interaction took place at 3:42 p.m. Plaintiff then signed some paperwork, after which, she was sedated at 3:46 p.m., and surgery commenced at 3:49 p.m.[1]

    Plaintiff's recollection oscillates after this moment in time. She remembers waking up in a recovery room in pain. She also remembers waking up in an ambulance being taken to Healthsouth Rehabilitation facility. At some point, Plaintiff remembers hearing her phone make an audible alert. When she looked at her phone, she noticed that someone had sent her a photograph just before surgery. The photograph is of Plaintiff, lying on her back in her hospital bed, in a hospital gown, looking at the camera and sticking her tongue out at the photographer. The picture came from a number unknown to Plaintiff at that time and was sent at 3:45 p.m. on December 18, 2013.[2]

---

[1] According to Defendant's deposition testimony "begins surgery" actually indicates the time that the anesthesiologist releases the patient to the surgical team, not necessarily when the first incision is made. Defendant's Motion for Summary Judgment, Exhibit B, Deposition of Kevin P. Schmalenberger, M.D., 25, Schweigart v. Schmalenberger, No. 2015-06598 (May 8, 2020).

[2] Id. at Exhibit A, 61.

Plaintiff indicates that she attempted to call the phone number, but no one answered, and the voicemail message did not indicate to whom the phone number belonged.

Plaintiff indicated in her deposition that after several months, she told her friend, Bill Davis, about the photo and he helped her do a "reverse look up" of the phone number. It was at that time that she found out the phone number belonged to Defendant Schmalenberger. After Plaintiff received her medical records, she learned that Defendant Schmalenberger had been her anesthesiologist. Again, Plaintiff did not exactly remember when she was able to connect Defendant Schmalenberger to the photo, but it would have been before June 30, 2014. On that date, Plaintiff underwent surgery on her right shoulder, and specifically asked her surgeon not to use Defendant Schmalenberger as the anesthesiologist because she "had a bad experience" with him.

While Plaintiff and Defendants agree on the facts as outlined above, what they do not agree on is how the picture came to be. Plaintiff indicates that she has no recollection of the picture being taken and that she was already under sedation when the picture was taken. Defendant Schmalenberger does not deny that the picture came from his cellphone, but has no recollection of taking it or why he would have. He testified at his deposition that "the only reason I can think of was that I was asked to do that" by Plaintiff.[3] Defendant Schmalenberger further indicated that while he cannot tell from the photograph whether Plaintiff had any form of sedation, he can say that the photograph shows that she had not been induced with anesthesia at that point "because her eyes are open."[4] Defendant Schmalenberger further stated that he has taken photos at a patient's request in the past and sent it to them, so while it was not common practice for him to do so, he had done it before.[5] Ultimately, Defendant Schmalenberger does not deny that he took or sent the photo.[6]

Plaintiff asserts that because of receiving the picture, she is afraid to leave her house. She no longer does activities that she used to enjoy. She bases this fear on her belief that she is afraid that "Dr. Schmalenberger has friends in places...Maybe he would, maybe they would put me to sleep and I'd never wake up again."[7] She stated in her deposition that she has had nightmares that Defendant has held her down to put a

---

[3] Id. at Exhibit B, 14.

[4] Id. at Exhibit B,15-16.

[5] Id. at Exhibit B, 22.

[6] Id. at Exhibit B, 20.

[7] Id. at Exhibit A, 77.

needle in her throat to kill her.[8] The fear has caused Plaintiff to install security cameras around her residence.[9] Plaintiff has been under the care of a physician's assistant at Summit Behavioral Health since October 2015. She is on medications for depression and anxiety, and she attends counseling appointments at least once a month.[10]

Plaintiff commenced this proceeding by filing a writ of summons on December 1, 2015. A complaint was filed on October 17, 2016, in which six counts were pleaded, Count I – Negligence of Dr. Kevin Schmalenberger; Count II – Invasion of Privacy – Intrusion Upon the Solitude and/or Seclusion and/or Private Affairs of Schweigert; Count III - Intentional Infliction of Emotional Distress; Count IV – Breach of Physician-Patient Confidentiality; and Count V – Gross Negligence of Dr. Kevin Schmalenberger. Holy Spirit Hospital was dismissed as a party by Order of Court on December 2, 2016. Defendants Schmalenberger and WSAA filed preliminary objections to the Complaint, which were granted in part and denied in part. As a result, Plaintiff filed an Amended Complaint on June 15, 2017, which pleaded five counts, Count I – Negligence of Dr. Kevin Schmalenberger; Count II – Invasion of Privacy – Intrusion Upon the Solitude and/or Seclusion and/or Private Affairs of Schweigert; Count III - Intentional Infliction of Emotional Distress; Count IV – Breach of Physician-Patient Confidentiality; Count V – Negligence – West Shore Anesthesia – Holy Spirit Hospital Vicarious Liability – Agency/Joint Venture; Count VI – Gross Negligence of Dr. Kevin Schmalenberger. Defendants have now filed a Motion for Summary Judgment.

## DISCUSSION

> Summary judgment is proper only when the pleadings, depositions, answers to interrogatories, admissions and affidavits and other materials demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.[11]

---

[8] Id.

[9] Id. at Exhibit A, 79.

[10] Id. at Exhibit A, 85-88.

[11] Safe Auto Ins. Co. v. Oriental-Guillermo, 170 A.3d 1170, 1173 (Pa. Super. 2017), aff'd, 214 A.3d 1257 (Pa. 2019), quoting Wall Rose Mut. Ins. Co. v. Manross, 939 A.2d 958, 962 (Pa. Super. 2007) (citations omitted).

Additionally, "a proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facia* cause of action or defense, and, therefore, there is no issue to be submitted to the jury."[12]

## NEGLIGENCE

Defendants' first argument in support of summary judgment is that "Plaintiff's negligence claims must be dismissed as Plaintiff has not provided expert testimony to establish the necessary elements."[13] Defendants argue that, generally, in order to proceed on a claim for medical malpractice, expert testimony is required to establish the standard of care, show the defendant's failure to exercise that standard of care and connect the defendant's failure to exercise the standard of care to the plaintiff's injuries.[14]

The requirement of expert testimony in a medical malpractice action is well-established in Pennsylvania. "[A] plaintiff must present medical expert testimony to establish that the care and treatment of the plaintiff by the defendant fell short of the required standard of care and that the breach proximately caused the plaintiff's injury. Hence causation is also a matter generally requiring expert testimony."[15] An exception to this requirement only exists "'where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons…'also conceptualized as the doctrine of *res ipsa loquitor*."[16]

*Res ipsa loquitor* is not a legal doctrine or theory of recovery, but rather a rule of circumstantial evidence that allows a jury to infer negligence without direct evidence of the elements of negligence.[17] Three conditions must be met before *res ipsa loquitor* may be invoked:

> (a) either a lay person is able to determine as a matter of common knowledge, or an expert testifies, that the result which has occurred does not ordinarily occur in the absence of negligence; (b) the agent or instrumentality causing harm was within the exclusive control of the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event.[18]

---

[12] McCarthy v. Dan Lepore & Sons Co., Inc., 724 A.2d 938, 940 (Pa. Super. 1998).

[13] Defendant's Motion for Summary Judgment, ¶ IV, Schweigart, No. 2015-06598 (May 8, 2020).

[14] Id. at ¶ 28.

[15] Toogood v. Owen J. Rogal, D.D.S., P.C., 824 A.2d 1140, 1145 (Pa. 2003).

[16] Id. (quoting Hightower-Warren v. Silk, 698 A.2d. 52, 54 (Pa. 1997)).

[17] Id.

[18] Id. at 1150.

Our appellate courts have typically applied the theory of *res ipsa loquitor* to the element of causation, the prime example being a sponge left in a patient's body during surgery. However, the Pennsylvania Supreme Court has declined to extend the theory to establish the standard of care and breach of duty.

> Not only does plaintiff have the burden of proving that the defendant did not possess and employ the required skill and knowledge, or did not exercise the care and judgment of a reasonable professional, he or she must also prove that the injury was caused by the failure to employ that requisite skill and knowledge. We have previously concluded that this must be accomplished with expert medical testimony presented at trial by doctors testifying as witnesses. [19]

In the Complaint, Plaintiff states that "a doctor-patient relationship was thus created between Plaintiff and Defendant Schmalenberger and thus Schmalenberger owed a duty of care to Plaintiff."[20] Plaintiff further states that "Defendant Schmalenberger specifically breached his duty by taking a photograph of Plaintiff while she was partially undressed in a hospital smock and presumably in a medicated state…[and] disseminated an unauthorized photograph of Plaintiff to her while she was along in her recovery room…"[21] Plaintiff concludes that as a result of this breach of duty, "Plaintiff suffered physical pain, distress and emotional damage."[22]

Plaintiff has not named an expert in this matter. Rather, Plaintiff filed a "Certificate of Counsel" that "the expert testimony of a Licensed Professional is unnecessary for prosecution of the claim(s) raised in the Complaint."[23] In Plaintiff's brief, Plaintiff explains further that she "possesses more expertise of her condition and its toll upon her than someone with the ordinary range of experience," and that "the actions of Defendant[s] on their face are a breach of the standard of care due any patient of a physician or their employer."[24] Plaintiff further asserts that "Plaintiff can prove, by her own testimony, a causal link between the photographs being taken and transmitted to her and the emotional damage she suffered immediately after and continues to suffer as a direct result of Defendant's action and inaction."[25] Ultimately, Plaintiff believes that expert testimony is not necessary, "as the conduct of Defendant(s)

---

[19] Id. at 1149.

[20] First Amended Complaint, ¶ 20, Schweigart, No. 2015-06598 (June 15, 2017).

[21] Id.

[22] Id.

[23] Certificate of Counsel, Schweigart, No. 2015-06598 (November 29, 2016).

[24] Plaintiff's Brief in Support of Denying Summary Judgment, 3, Schweigart, No. 2015-06598 (June 15, 2020).

[25] Id.

is so far outside the standard of care that her testimony would be sufficient to establish every element of negligence."[26]

Plaintiff, at no point, states what the standard of care in this matter is; only that Defendant Schmalenberger owed her a duty of care because he was her anesthesiologist. There is no expert witness to say that Defendant Schmalenberger owed Plaintiff a specific duty not to photograph her before surgery. Plaintiff wants the finder of fact to assume that the standard of care that doctors should not photograph patients goes without saying. However, without knowing what the standard of care is, the finder of fact cannot reasonably determine if Defendant Schmalenberger breached the standard of care, and by default, cannot determine whether the breach caused injury.

Additionally, in this matter, Plaintiff claims her injuries were "physical pain, distress and emotional damage."[27] Plaintiff was interrogated extensively in her deposition with regard to her medical history. Plaintiff has had head and neck injuries, spine surgery, hip replacement, shoulder surgery, frequent headaches, Lyme disease, and was previously treated for depression with medication. Plaintiff's medical history goes back to a car accident that occurred in 1986, and Plaintiff's injuries are so severe, that she has been collecting Social Security disability payments since around 1986.[28] Without an expert to differentiate between Plaintiff's preexisting conditions and any conditions that arose as a result of the Defendants' actions, a lay jury will not be able to determine causation. Determining the specific cause of Plaintiff's medical conditions in this case will require the finder of fact to thoroughly examine Plaintiff's medical records and determine the cause of each and every diagnosis, something that is neither simple nor obvious, and thus beyond the scope of the exception to the medical expert requirement.

Defendant's Motion for Summary Judgment as to Count I – Negligence is GRANTED.

## INVASION OF PRIVACY

Defendants next assert that Plaintiff's invasion of privacy claim should be dismissed because the statute of limitations has lapsed. The statute of limitations for an invasion of privacy claim is set forth in 42 Pa.C.S.A. § 5523, which requires that an action for invasion of privacy be commenced within one year.

Plaintiff did not respond to Defendants' assertions that the statute of limitations has lapsed. As we are required to look at the facts in the light most favorable to the

---

[26] Id. at 4.

[27] First Amended Complaint, ¶ 25, Schweigart, 2015-06598 (June 15, 2017).

[28] Defendant's Motion for Summary Judgment, Exhibit A, Deposition of Jacqueline Schweigart, 18, Schweigart, 2015-06598 (May 8, 2020).

non-moving party, we will determine that, at the very latest, Plaintiff knew that Defendant Schmalenberger had sent her the photograph on June 30, 2014, the day that she asked the doctor performing her shoulder surgery to insure that Defendant Schmalenberger was not her anesthesiologist for that procedure.[29] The writ of summons was filed on December 1, 2015, just over seventeen months after the latest possible moment of discovery of the photographer's identity.

Defendant's Motion for Summary Judgment as to Count II – Invasion of Privacy is GRANTED.

## BREACH OF PHYSICIAN-PATIENT CONFIDENTIALITY

Defendant's next argument is that Plaintiff's claim for breach of physician-patient confidentiality should be dismissed because Plaintiff has failed to establish that Defendant Schmalenberger "breached the [physician-patient] privilege by releasing/providing confidential information, gained during the scope of the relationship to a third party," and fails to show that "the information disclosed would tend to blacken the character of the patient."[30]

Pennsylvania courts have recognized a cause of action for breach of the physician-patient privilege.[31] The cause of action is based on the evidentiary privilege applicable to civil cases set forth in 42 Pa.C.S.A. § 5929, which states that

> [n]o physician shall be allowed, in any civil matter, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on account of personal injuries.

---

[29] Id. at Exhibit A, 67.:

Q: And the record – your medical record indicates that you told Dr. Boal that you had a bad experience with Dr. Schmalenberger, and you did not want him as an anesthesiologist?
A: Yes.
Q: So that is something you recall doing?
A: I do.
Q: And if your medical record indicates that that took place on June 30, 2014, that means that you would have done the reverse look up by then, and would have connected the dots with your medical records?
A: Right.
Q: So from that point in time, you knew that the picture was sent from Dr. Schmalenberger's phone?
A: Yes.

[30] Id. at ¶ 103.

[31] See Moses v. McWilliams, 549 A.2d 950 (Pa. Super. 1988) and Haddad v. Gopal, 787 A.2d 975 (Pa. Super. 2001).

The Superior Court has found that "the rationale of the statute…was 'designed to create a confidential atmosphere in which a patient will feel free to disclose all possible information which may be useful in rendering appropriate treatment.'"[32] They have further explained that "the privilege is limited to information which would offend the rationale of the privilege…a doctor must not expose a patient's communications if doing so would release confidential information which was acquired in attending to and treating the patient and which would blacken the character of the patient."[33] So while the Superior Court has found that "doctors have an obligation to their patients to keep communications, diagnosis and treatment completely confidential," the standard must be limited to the "context of the privilege statute which protects against the disclosure of information directly related to a patient's confidential information that blackens their reputation."[34] Thus, in order to succeed on a claim for breach of physician-patient confidentiality, there must be (1) a disclosure; (2) of a patient's communications; (3) that tend to "blacken the character of the patient"; and (4) was done without consent of the patient.

Defendants assert that no disclosure occurred, in that the photograph was sent directly by Defendant Schmalenberger to Plaintiff. Plaintiff counters by saying that a breach of the relationship occurred by taking the photograph and "then saving said photo to his phone for his personal use, in addition to transmitting the same to Plaintiff anonymously."[35] Further, in her Complaint, Plaintiff alleges that "said photograph was transmitted using a series of cellular networks, wifi-networks that were both closed and open, leaving open the possibility that said photograph was intercepted, read or viewed by an undeterminable number of individuals."[36]

Disclosure is not specifically defined by the statute or case law. In fact, in the cases that have alleged breach of physician-patient confidentiality, we could find none that did not have an obvious statement to a third party.[37] Without definition from any authority, the plain meaning of the term is used. According to Black's Law Dictionary

---

[32] Grimminger v. Maitra, 887 A.2d 276, 279 (Pa. Super. 2005)(quoting Miller Oral Surgery, Inc. v. Dinello, 611 A.2d 232, 235 (Pa. Super. 1992)).

[33] Id.

[34] Id. at 280 (citing Hadad, 787 A.2d at 981).

[35] Plaintiff's Brief in Support of Denying Summary Judgment, 6, Schweigart, No. 2015-06598 (June 14, 2020).

[36] First Amended Complaint, ¶ 43, Schweigart, No. 2015-06598 (June 15, 2017).

[37] In Hadad, a physician made a statement to the patient's husband regarding her diagnosis of a sexually transmitted disease. In Grimminger, a physician made a statement to the patient's employer regarding injuries sustained to his shoulder. In Moses, a physician revealed a diagnosis of the patient to a defense attorney in personal injury matter. These examples are not exclusive of the body of case law in this arena (there are a number of cases where probationers have filed suit against doctors for revealing the results of drug testing to probation officers), but illustrative of the point that with the specific claim for breach of physician-patient confidentiality, there must be a disclosure of information to a third party.

(11th ed. 2019), "disclose" means "to make something known or public; to show something after a period of inaccessibility or of being unknown; to reveal." Taking our que from that definition, there was clearly no disclosure of confidential information in this matter. Defendant Schmalenberger sent the photo to Plaintiff alone, and Plaintiff raises no allegations otherwise. She does not allege that he sent it to his friends or colleagues; she does not allege that he submitted it to any publication; and she does not allege that he posted it on social media.[38]

We do not subscribe to Plaintiff's belief that someone could have intercepted the photo through open wifi or cellular networks. That would be analogous to saying that someone could have heard a private conversation taking place between a physician and his patient in a closed exam room by hiding in an air duct, or intercepting confidential mail through the United States Postal Service.

Defendant's Motion for Summary Judgment as to Count IV - Breach of Physician-Patient Confidentiality is GRANTED.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant's next argument asks the Court to dismiss Plaintiff's claim for intentional infliction of emotional distress because the conduct of Defendant Schmalenberger was not extreme or outrageous enough to meet the burden of proof for intentional infliction of emotional distress and because Plaintiff did not suffer a physical injury or impact as a result of the alleged behavior.

First, we note that this Court's Order dated February 22, 2017 limited Plaintiff's claim for intentional infliction of emotional distress to nominal damages because Plaintiff does not have an expert to testify to her emotional distress related to Defendant's conduct. For this reason, we will not delve into the argument that Plaintiff cannot prove her injuries. Instead, we will look to whether Plaintiff can proceed on the other elements of intentional infliction of emotional distress.

The tort of intentional infliction of emotional distress is nebulous. It is defined by the Restatement (Second) of Torts as "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."[39] Primarily, it requires the plaintiff to prove that the conduct of the defendant was outrageous, and "it is for the court to determine, in the first instance,

---

[38] In an unreported opinion, the Superior Court recently rejected the argument that a nurse's statements on Facebook rose to the level of a breach of patient-physician confidentiality. See Shaner v. UPMC Susquehanna, 922 MDA 2019 (Pa. Super. March 24, 2020).

[39] Kazatsky v. King David Memorial Park, Inc., 527 A.2d 988, 991 (Pa. 1987)(quoting Restatement (Second) of Torts § 46 (1965)).

whether the actor's conduct can reasonably be regarded as so extreme and outrageous as to permit recovery."[40]

Outrageous conduct is not well defined, as our Supreme Court explained in Kazatsky v. King David Memorial Park, Inc., 527 A.2d 988 (Pa. 1987).

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community...Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.[41]

The Court went on to say that "[t]he tort of intentional infliction of emotional distress differs from traditional intentional torts in an important respect: it provides no clear definition of the prohibited conduct."[42] So what exactly *is* outrageous conduct? "'The term outrageous is neither value free nor exacting. It does not objectively describe an act or series of acts; rather, it represents an evaluation of behavior.'"[43]

Pennsylvania Courts have allowed recovery for intentional infliction of emotional distress only in "very egregious cases."[44] We have examined a number of cases, the most heinous of which appears to be Papieves v. Lawrence, 263 A.2d 118 (Pa. 1970). In that case, the plaintiffs' son was struck by defendant while driving his car. The defendant then buried the body, which was not found until two months later. The defendant never reported the accident or told the plaintiffs that he had killed their son. The Pennsylvania Supreme Court held that the defendant's conduct was "intentional and wanton" and caused the plaintiffs "extraordinary mental distress which is attributable to that conduct."[45]

For every case that our appellate courts have determined to be outrageous conduct, there are several in which they did not. While we have not found a case precisely analogous to this one, we examined several where harassment was at issue.

---

[40] McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 661 (Pa. Super. 2000)(quoting Strickland v. University of Scranton, 700 A.2d 979, 987 (Pa. Super. 1997)).

[41] Kazatsky, 527 A.2d at 991 (quoting Restatement (Second) of Torts § 46 cmt. D (1965)).

[42] Id. at 994.

[43] Id. (quoting Givelber, The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct, 82 Colum.L.Rev. 42, 52-53 (1982)).

[44] Hoy v. Angelone, 691 A.2d 476, 482 (Pa. Super. 1997).

[45] Papieves, 263 A.2d at 122.

In Hoy v. Angelone, 691 A.2d 476, 482 (Pa. Super. 1997), the plaintiff's supervisor at work subjected her to "various forms of abusive treatment, including sexual propositions, vile and filthy language, off-color jokes, physical groping, and the posting of sexually suggestive pictures," which distressed the plaintiff so much that she took medical leave from her job in order to receive psychiatric treatment. The defendant admitted to the conduct, and upon her return to work, the plaintiff requested a transfer to another department. The Superior Court noted that "as a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for intentional infliction of emotional distress," holding that "although the record fully establishes and supports the existence of a sexually hostile work environment, such evidence alone does not establish the requisite outrageousness to recover under a claim of intentional infliction of emotional distress."[46]

Plaintiff refutes the Defendants' contention that the conduct of Defendant Schmalenberger was not outrageous by simply saying "the facts reveal that Defendant Schmalenberger's conduct was certainly outrageous."[47] However, even viewing the facts in the light most favorable to Plaintiff, and accepting all of her assertions as true, that Defendant Schmalenberger maliciously took the photograph and sent it to Plaintiff with evil intentions, the conduct does not rise to the level of abusive behavior in Hoy, let alone the objectively egregious behavior in Papieves. Defendant Schmalenberger took one photograph, and sent it, without text or comment, to Plaintiff's cell phone. There was not a pattern of conduct; there were no threats that accompanied the photograph; there was only one, admittedly poor, photograph of Plaintiff. Defendant Schmalenberger's actions were hardly outrageous or extreme "beyond all bounds of decency."

Defendant's Motion for Summary Judgment as to Count III - Intentional Infliction of Emotional Distress is GRANTED.

## GROSS NEGLIGENCE/PUNITIVE DAMAGES

Defendants next argue that Plaintiff's claim for gross negligence and punitive damages should be dismissed, because even in the light most favorable to the Plaintiff, the record does not support a finding of gross negligence, and even if it did, gross negligence is insufficient to recover punitive damages under the Medical Care Availability and Reduction of Error Act ("MCARE Act").

Pennsylvania Courts have held that gross negligence is different from ordinary negligence. Gross negligence has been examined most commonly with regard to cases arising out of medical malpractice involving mental health care providers because in order to overcome immunity for mental health care providers, a plaintiff must show that

---

[46] Hoy, 691 A.2d at 483.

[47] Plaintiff's Brief in Support of Denying Summary Judgment, 6, Schweigart, No. 2015-06598 (June 14, 2020).

the provider acted with gross negligence.[48] While this is not a mental health malpractice case, our appellate courts have applied the definition of gross negligence used in mental health malpractice cases in other contexts.[49] Accordingly, we will do the same.

Gross negligence was first defined by the Superior Court in Bloom v. Dubois Regional Medical Center, 597 A.2d 671, 679 (Pa. Super. 1991). The Court, after examining case law and legislative intent in both Pennsylvania and other jurisdictions, held that gross negligence is "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care."[50] The Pennsylvania Supreme Court adopted this definition of gross negligence in Albright v. Abington Memorial Hosp., 696 A.2d 1159, 1167 (Pa. 1997), and further held that "when presented with facts that do not meet the definition of gross negligence, as a matter of law, a court may withdraw the factual determination of gross negligence from the jury and decide the question as a matter of law."[51]

Again, we will look to when our appellate courts have found facts sufficient to support a finding of gross negligence. In Bloom, the plaintiff was a psychiatric patient, exhibiting severe psychosis. The plaintiff was left unattended and then attempted to hang herself with her shoelaces. The Superior Court found that the defendants failed to take adequate precautions to ensure the plaintiff's safety, including properly diagnosing her despite being informed of her symptoms, and that such conduct was sufficient to support a claim for gross negligence.[52]

In Albright, the decedent was involuntarily committed and diagnosed with bipolar disorder. She was released, by order of court, to a 90 day outpatient program, where she missed several appointments and admitted, repeatedly, to counselors and her physician that she was not taking her medication. Her behavior became erratic. On day 85, her husband, the plaintiff, called the hospital and her counselors and asked for them to commit her for failing to comply with the outpatient program. The defendants responded that the plaintiff should commence involuntary commitment proceedings, which he did not do. Her condition continued to deteriorate, and she eventually perished in a fire that may have been caused by her "careless smoking." The Pennsylvania Supreme Court determined that no reasonable jury could have found that the defendant acted in a grossly negligent manner because there would not have been sufficient time for the hospital to do an involuntary commitment under the 90 day order,

---

[48] See 50 P.S. § 7114(a).

[49] See Ratti v. Wheeling Pittsburgh Steel Corp., 758 A.2d 695 (Pa. Super. 2000).

[50] Bloom, 597 A.2d at 679.

[51] Albright, 696 A.2d at 1167.

[52] Bloom, 597 A.2d at 679.

and their advice for plaintiff to initiate an involuntary commitment petition was not taken.[53]

As to punitive damages, the MCARE Act is clear: "a showing of gross negligence is insufficient to support an award of punitive damages."[54] The MCARE Act instead provides that "[p]unitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others."[55] The Superior Court has held that "recklessness is distinguishable from negligence on the basis that recklessness requires conscious action or inaction which creates a substantial risk of harm to others, whereas negligence suggests unconscious inadvertence."[56]

Neither party addresses the definition of gross negligence. Defendants simply state that the facts do not support a finding of gross negligence, without any further analysis, and Plaintiff ignores the argument regarding gross negligence altogether. Defendants then state that Plaintiff has insufficiently pleaded punitive damages in the complaint by misidentifying the standard. We do note that while the allegations are under the title of "gross negligence," the Plaintiff does identify the correct standard by alleging that "the acts or omissions, viewed objectively from Schmalenberger's standpoint at the time they occurred, involved an extreme degree of risk considering the potential haarm to Plaintiff; Schmalenberger had actual, subjective awareness of the risk."[57] However, the record does not support these allegations.

Plaintiff's testimony on deposition is that she does not really remember meeting Defendant Schmalenberger.[58] She recounts that "the only thing we talked about was he asked me if I had any heart conditions and stuff, like I told you, and then told me that he would sedate me to relax me, and which he put some type of anesthesia or something in my IV, and then they was ready for me in surgery."[59] After receiving the photo, Plaintiff admits that she did not get any further text messages or calls from the number.[60] She tried calling the number and no one answered, and she did not leave a message.[61] She did not tell anyone about the photograph until "several months

---

[53] Albright, 696 A.2d at 1167.

[54] 40 P.S. § 1303.505(b).

[55] 40 P.S. § 1303.505(a).

[56] Kibler v. Blue Knob Recreation, 184 A.3d 974, 985-986 (Pa. Super. 2018)(citing Tayar v. Camelback Ski Corp., Inc., 47 A.3d 1190, 1203 (Pa. 2012)).

[57] First Amended Complaint, ¶ 48, Schweigart, No. 2015-06598 (June 15, 2017).

[58] Defendant's Motion for Summary Judgment, Exhibit A, 36, Schweigart, No. 2015-06598 (May 8, 2020).

[59] Id. at Exhibit A, 37.

[60] Id. at Exhibit A, 56.

afterwards," when she told a friend who helped her look up the owner of the telephone number.[62] When asked if she knew or believed if the photo was sent to anyone else, Plaintiff said "I have no clue."[63]

Plaintiff states that she is afraid that "Dr. Schmalenberger has friends in places, and he just for whatever reason it was the he took my picture, maybe he knew me before, I don't know. And I think, you know, he has friends and stuff. Maybe he would – maybe they would put me to sleep and I'd never wake up again."[64] We do not suggest that Plaintiff's fear is not real, but, objectively, there is nothing in the record to support her allegations that Defendant Schmalenberger "subjectively intended to harm Plaintiff and he know [sic] or should have known injury would result from his gross deviation... his conduct was reckless willful and malicious and injury resulted to Plaintiff."[65] In her own words, she does not know the reason for Defendant Schmalenberger taking the photo, and there is no document, admission or witness to show otherwise. Simply saying that "maybe" Defendant would do something to her is not enough without showing on what that belief is based. Even ignoring Defendant Schmalenberger's assertions that Plaintiff asked him to take the photo, without knowing the reason for Defendant Schmalenberger's actions, Plaintiff cannot show that Defendant Schmalenberger acted with the state of mind necessary to show gross negligence, let alone recklessness. There are simply too many unknowns.

We would also be remiss in failing to note that if the Plaintiff is required to have an expert witness testify as to the standard of care for ordinary negligence in a medical malpractice case, it follows that she would need an expert witness to testify as to the standard of care for gross negligence. The Defendants did not raise that argument in their motion for summary judgment, so we will not rely on it as the basis of our opinion.

Defendants' Motion for Summary Judgment as to Count V - Gross Negligence and punitive damages is GRANTED.

PLAINTIFF'S CLAIMS AGAINST
DEFENDANT WEST SHORE ANESTHESIA ASSOCIATES

Last, Defendant's assert that there is no independent cause of action against Defendant West Shore Anesthesia Associates, so if the claims are dismissed against Defendant Schmalenberger, they should also be dismissed against Defendant West Shore Anesthesia Associates.

---

[61] Id. at Exhibit A, 46.

[62] Id. at Exhibit A, 63.

[63] Id. at Exhibit A, 72.

[64] Id. at Exhibit A, 77.

[65] See First Amended Complaint, ¶ 50, Schweigart, No. 2015-06598 (June 15, 2017).

We note that the claim for vicarious liability in Plaintiff's original complaint was dismissed on preliminary objections by this Court on February 22, 2017. Additionally, there are no independent causes of action or facts alleged against Defendant West Shore Anesthesia Associates. Therefore, as we have dismissed all claims against Defendant Schmalenberger, we must also dismiss them against Defendant West Shore Anesthesia Associates.

Defendant's Motion for Summary Judgment as to the claims against Defendant West Shore Anesthesia Associates is GRANTED.

By the Court,

_____
Matthew P. Smith,                    J.

Michael O. Palermo, Esq.
3300 Trindle Road
Camp Hill, PA 17011

Daniel Grill, Esq.
305 N. Front Street
Harrisburg, PA 17101

**TRUE COPY FROM RECORD**
In Testimony whereof, I here unto set my hand
and the seal of said Court at Carlisle, Pa,
This ____ day of _____, 20 ____
_____ Prothonotary

Page 15 of 15